465 S.E.2d 399

**Sarah MARTIN, Plaintiff
Below, Appellant,**

v.

**RANDOLPH COUNTY BOARD OF
EDUCATION, Defendant
Below, Appellee.**

**No. 22680.**

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 26, 1995.

Decided Nov. 17, 1995.

---

10. We express no opinion concerning the merits of the underlying case.

**302**

Marjorie Martorella, Charleston, for Appellant.

M. Drew Crislip, Clarksburg, for Appellee.

CLECKLEY, Justice:

Sarah Martin, the plaintiff below and appellant herein, appeals the May 2, 1994, order of the Circuit Court of Kanawha County, which affirmed the administrative law judge's decision to deny her grievance against her employer, the Randolph County Board of Education (Board), the defendant below and appellee herein. She raises numerous assignments of error and argues the judgment of the circuit court is clearly wrong both factually and legally. After reviewing the record and briefs of the parties, we find it necessary to remand this case for further development.

## I.

### FACTS AND PROCEDURAL BACKGROUND

In 1981, the plaintiff began employment with the Board as an Assistant Fiscal Officer, which position was classified as professional. The plaintiff worked at the Board's central office finance department. She holds a degree in business education and business administration and has additional credit hours in education administration. It is undisputed the plaintiff's work history is commendable.

Due to cutbacks in personnel faced by the Board during the 1988–89 and 1989–90 school years,[1] several employees received notices in the Spring of 1990 that they were being considered for reduction in force (RIF). In March of 1990, the plaintiff was informed that she was recommended for reduction in force based on lack of need for the position and due to reorganization of the central office.

On March 29, 1990, the plaintiff agreed to a change in contract. Her job title was changed from Assistant Fiscal Officer to Accountant III/Employee Benefits Specialist. The new position was classified as service personnel. She suffered a reduction in salary from $28,494 to $24,500, but her job duties remained essentially the same. The plaintiff stated she had no real choice in the matter; she was faced with the option of accepting the lesser position or losing her job. She did not protest the transfer.

It should be noted that two other Accountant IIIs in the central office, Irene Marstiller and Sharon Howell, perform duties that are mostly clerical in nature. However, the plaintiff receives a substantial salary supplement, $7,100 per year, as opposed to $840 per year received by Ms. Marstiller and Ms. Howell.

Prior to the plaintiff's reclassification, Roger Brady, associate superintendent and personnel officer, informed the plaintiff that other employees in the central office finance department would also be affected by the budget cuts. Joyce Hutton, coordinator of computer services, was to be reclassified to the position of computer specialist, a service position, and would suffer a reduction in pay along with the plaintiff. However, Ms. Hutton transferred to a higher paying teaching position and never worked under the terms of the reclassification.

The plaintiff asserts that Mr. Brady informed her that Chriss Kiess, a purchasing agent in the finance department, would also

---

1. David Hart from the Board's personnel office testified at the Level IV hearing that during this time frame at least eight individuals underwent contract modifications or were recommended for reduction in force. The administrative office took the "brunt" of the cuts.

have his salary reduced the following year. Mr. Kiess was not reclassified, however, as he was always classified as service personnel. The evidence shows that Mr. Kiess did not suffer a pay reduction.[2] Mr. Kiess and the plaintiff have approximately the same number of years of service. During the 1989–90 school year, Mr. Kiess's salary was $28,070 while the plaintiff earned $28,494. In the 1992–93 school year, the plaintiff's salary was reduced to $26,456, but Mr. Kiess's salary rose to $30,356.

By letter dated April 2, 1992, the plaintiff was advised she was being considered for possible transfer and subsequent assignment for the 1992–93 school year. She was notified that the reason for the anticipated change was due to the retirement of an accountant in the finance department and the probable abolishment of that position. The plaintiff requested a hearing on this matter. She received notice of the April 22, 1992, hearing by letter dated April 20, 1992.

On May 5, 1992, the plaintiff was advised that the Board voted to place her on the transfer list. By letter dated June 30, 1992, she was further informed that the Board approved her assignment for the 1992–93 school year. Due to the retirement of one of the accountants in the finance department whose position would be abolished, the duties held by that person would be divided between three other accountants, including the plaintiff. Accordingly, the plaintiff's workload increased and it was necessary for her to work some overtime. The plaintiff did not receive an increase in salary to assume these additional duties.

In July of 1992, the plaintiff filed this grievance alleging certain procedural problems with notice and sufficiency of the hearing, along with the Board's "continuing practice of adding job responsibilities while reducing pay."[3] The Level II hearing was held on December 14, 1992. The plaintiff chose to bypass the Level III stage of the grievance procedure. On February 22, 1993, the Level IV hearing was held. The administrative law judge (ALJ) rendered

---

**2.** During the Level IV hearing, there was some testimony that Mr. Kiess's salary was adversely affected the previous year; however, the evidence shows this was not the case.

**3.** The plaintiff raised the following grounds in her grievance:

"1. The letter I received dated April 2, 1992 of possible transfer did not give me notice of what was being proposed. It was vague and ambiguous. It does not state whether the transfer is to another physical job location, to another job description, or to another work assignment.

"2. I never received a statement of the reasons for the proposed transfer pursuant to West Virginia Code 18A-2-7 and my written request dated April 16, 1992. No reasons were ever given until long after the hearing, when I received a letter from Superintendent John Wilson on July 1, 1992.

"3. I was not given reasonable notice of the Board's hearing held April 22, 1992.

"4. At the hearing before the Board, the reasons for the proposed transfer were not shown as required by West Virginia Code 18A-2-7.

"5. No meaningful hearing is possible without first being informed of what specific transfer or assignment is being proposed. Therefore, the hearing I had was not sufficient for any purpose.

"6. I was not notified of the Board's recommendation for transfer and the reasons for the transfer in writing, by certified mail, return receipt requested, within ten days as required in West Virginia Code 18A-2-7.

"7. My reassignment is part of a continuing practice of adding job responsibilities while reducing pay. That continuing practice began with a RIF and subsequent reassignment and pay reduction in the spring of 1990, which is also grieved. The RIF was justified by the superintendent as being for lack of need, but in fact nothing changed except my job title and the pay cut I received. I was further told that all three employees in similar circumstances would be RIF'd; myself and another woman that year and a male employee the following year. I received a RIF letter and was subsequently reassigned, the other woman received a RIF letter but subsequently left for the classroom, and the man's status remains unchanged.

"This grievance is filed on July 15, 1992, within ten days of an informal conference with my supervisor on July 6, 1992.

"I therefore request that I be reassigned to the position I held in the spring of 1990, prior to my RIF and subsequent reassignment and pay cut, with back pay to that date adjusted for any regular pay increases which have occurred;

"Or, in the alternative, that I be reassigned to the position I held in May 1992 with appropriate compensation increase to reflect the substantially increased work load and responsibilities caused by change in State statutes."

her decision on June 30, 1993, and denied the grievance.

## II.

## DISCUSSION

### A.

### Standard of Review

 This Court reviews appeals from the West Virginia Educational Employees Grievance Board under W.Va.Code, 18–29–7 (1985), which provides that a court may set aside a decision of a hearing examiner for the Board if it is arbitrary, capricious, an abuse of discretion, or contrary to law. *Board of Education of the County of Mercer v. Wirt,* 192 W.Va. 568, 453 S.E.2d 402 (1994). The scope of review under the arbitrary and capricious standard is narrow, and a court is not to substitute its judgment for that of the hearing examiner. In *Randolph County Board of Education v. Scalia,* 182 W.Va. 289, 292, 387 S.E.2d 524, 527 (1989), Justice Miller compared the standard of review applicable to a review of an ALJ's decision under W.Va. Code, 18–29–7,[4] to that of an administrative decision under the Administrative Procedures Act, W.Va.Code, 29A–5–4(g) (1964): "Both statutes contain virtually the same criteria for reversal of the factual findings made at the administrative level, i.e., that they are 'clearly wrong in view of the reliable, probative and substantial evidence on the record as a whole.'" In reviewing the decision of an ALJ following a Level IV grievance hearing, the circuit court should give deference to such findings. In Syllabus Point 1 of *Ran-*

*dolph County Board of Education v. Scalia, supra,* we stated:

"A final order of the hearing examiner for the West Virginia Educational Employees Grievance Board, made pursuant to W.Va.Code, 18–29–1, *et seq.* (1985), and based upon findings of fact, should not be reversed unless clearly wrong."

Similarly, in reviewing an ALJ's decision that was affirmed by the circuit court, this Court accords deference to the findings of fact made below. This Court reviews decisions of the circuit under the same standard as that by which the circuit reviews the decision of the ALJ. We must uphold any of the ALJ's factual findings that are supported by substantial evidence, and we owe substantial deference to inferences drawn from these facts. Further, the ALJ's credibility determinations are binding unless patently without basis in the record. Nonetheless, this Court must determine whether the ALJ's findings were reasoned, *i.e.,* whether he or she considered the relevant factors and explained the facts and policy concerns on which he or she relied, and whether those facts have some basis in the record. We review *de novo* the conclusions of law and application of law to the facts. Thus, the determination of the proper legal standard for assessing a *prima facie* case in a sex discrimination claim is a question of law over which we have plenary review. Applying this blend of deferential-plenary standard of review, we conclude the ALJ's finding that the plaintiff failed to establish a *prima facie* case of discrimination and the finding that the reclassification grievance was time barred were wrong as a

---

4. W.Va.Code, 18–29–7, provides:

"The decision of the hearing examiner shall be final upon the parties and shall be enforceable in circuit court: Provided, That either party may appeal to the circuit court of the county in which the grievance occurred on the grounds that the hearing examiner's decision (1) was contrary to law or lawfully adopted rule, regulation or written policy of the chief administrator or governing board, (2) exceeded the hearing examiner's statutory authority, (3) was the result of fraud or deceit, (4) was clearly wrong in view of the reliable, probative and substantial evidence on the whole record, or (5) was arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. Such appeal

shall be filed in the circuit court of Kanawha County or in the circuit court of the county in which the grievance occurred within thirty days of receipt of the hearing examiner's decision. The decision of the hearing examiner shall not be stayed, automatically, upon the filing of an appeal, but a stay may be granted by the circuit court upon separate motion therefor.

"The court's ruling shall be upon the entire record made before the hearing examiner, and the court may hear oral arguments and require written briefs. The court may reverse, vacate or modify the decision of the hearing examiner or may remand the grievance to the chief administrator of the institution for further proceedings."

matter of law. Accordingly, the case is reversed and remanded for further development.

## B.

### *Default Judgment*

■ The plaintiff contends the ALJ and the circuit court erred by holding that she was not entitled to default judgment. Prior to the Level II grievance hearing, the plaintiff filed a motion for default judgment alleging the Board failed to conduct the requested hearing within five days of receiving the grievance. W.Va.Code, 18–29–4(b) (1992), provides the Board "shall conduct a hearing in accordance with section six [§ 18–29–6] of this article within five days of receiving the appeal and shall issue a written decision within five days of such hearing." W.Va. Code, 18–29–3(a) (1992), further provides that a grievant "shall prevail by default" if the grievance evaluator "fails to make a required response in the time limits." [5]

The grievance was filed on July 15, 1992, and the time limit for the hearing was extended by mutual agreement to November 15, 1992, and then to December 4, 1992. The hearing was rescheduled for December 14, 1992, because the superintendent was unable to attend on December 4, 1992. Accordingly, the plaintiff asserts the Board failed to provide a hearing within five days after December 4, 1992, which entitled her to default judgment.

The ALJ found that because the plaintiff entered into an agreement extending the statutorily prescribed time limits, she waived her right to a hearing within five days.

The Board argues the testimony of Cheryl Corley, the person in charge of scheduling hearings, shows the plaintiff agreed to the December 14, 1992, hearing date. Furthermore, although not entered into evidence below, the Board asserts public records indicate that taking into account weekends and two snow days, December 14, 1992, was the fourth work day after December 4, 1992.[6] Therefore, the Board contends the plaintiff was afforded a timely hearing.

■ Unquestionably, under this unusual statutory scheme, the plaintiff is entitled to a default judgment if she was denied her right to a *response* within the period contemplated by the statute.[7] The issue the plaintiff raises, however, deals specifically with a timely hearing. The language of the statute is not so precise as to the required relief when a hearing is not timely unless we interpret the term "respond" as being inclusive of a hearing. W.Va.Code, 18–29–3(a), states the time limits at each level specified "shall be considered as the maximum number of days al-

---

**5.** W.Va.Code, 18–29–3(a), states, in pertinent part:

"The number of days indicated at each level specified in section four of this article shall be considered as the maximum number of days allowed ...: Provided, That the specified time limits may be extended by mutual written agreement.... If a grievance evaluator required to respond to a grievance at any level fails to make a required response in the time limits required in this article, unless prevented from doing so directly as a result of sickness or illness, the grievant shall prevail by default. Within five days of such default, the employer may request a hearing before a level four hearing examiner for the purpose of showing that the remedy received by the prevailing grievant is contrary to law or clearly wrong."

**6.** "Days" refer to regular workdays, excluding holidays and weekends. W.Va.Code, 18–29–2(b) (1992).

**7.** The language in W.Va.Code, 18–29–3(a), states that if a grievance evaluator fails to respond

within the time period required by the statute, "the grievant *shall* prevail by default." (Emphasis added). After the default, the only remaining consideration is the convening of a level four hearing to determine whether "the remedy received by the prevailing grievant is contrary to law or clearly wrong." Apparently, the relevant factors enunciated in Syllabus Point 3 of *Parsons v. Consolidated Gas Supply Corp.*, 163 W.Va. 464, 256 S.E.2d 758 (1979), do not apply. In civil actions in circuit courts, we stated the following factors should be considered by a court where there has been an appearance but a late answer filed by the defaulting party: "(1) The degree of prejudice suffered by the plaintiff from the delay in answering; (2) the presence of material issues of fact and meritorious defenses; (3) the significance of the interests at stake; and (4) the degree of intransigence on the part of the defaulting party." Syl. pt. 3, in part, *Parsons, supra.* We need not decide today what, if any, other considerations may preclude a default judgment under W.Va.Code, 18–29–3. We note, however, that the statute provides exceptions only for the "sickness or illness" of a grievance evaluator.

lowed and, if a *decision* is not rendered at any level within the prescribed time limits,· the grievant may appeal to the next level[.]" (Emphasis added). Although the term "respond" is used in W.Va.Code, 18–29–4(a)(2), and the term "response" in W.Va.Code, 18–29–4(a)(3), in reference to a grievance at the level one stage only, we believe the term "respond" is inclusive of a hearing as it applies to defaults. Indeed, the very language discussing defaults under W.Va.Code, 18–29–3(a), states "[i]f a grievance evaluator required to respond to a grievance *at any level* fails to make a required response in the time limits required in this article...." (Emphasis added). In other words, we believe the term "response" was intended to include hearings.

 The question here, however, is whether the plaintiff waived her right to insist on literal compliance with this limitation period. There is a predicate principle, however, that must be kept in mind as we review the issue of waiver. Of critical importance to our analysis is the finding of the ALJ that the mandatory time period was waived. As we suggested at the outset, it is well established that the findings of the ALJ must be upheld, if at all, on the basis articulated by the ALJ. *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443, 462 (1983). Moreover, we base our review of the ALJ's determination on the full administrative record that was before the ALJ at the time she made her decision.

 As a general rule, we uphold the factual findings of an ALJ if they are supported by substantial evidence. *See Frymier–Halloran v. Paige*, 193 W.Va. 687, 458 S.E.2d 780 (1995). Under these facts and circumstances, we find there was substantial evidence supporting the ALJ's findings. We cannot overlook the role that credibility places in factual determinations, a matter reserved exclusively for the trier of fact. We must defer to the ALJ's credibility determinations and inferences from the evidence, despite our perception of other, more reasonable conclusions from the evidence. *Board of Education of the County of Mercer v. Wirt*, 192 W.Va. at 579, 453 S.E.2d at 413

("[i]ndeed, if the lower tribunal's conclusion is plausible when reviewing the evidence in its entirety, the appellate court may not reverse even if it would have weighed the evidence differently if it had been the trier of fact"). Whether or not the ALJ came to the best conclusion, however, she was the right person to make the decision. An appellate court may not set aside the factfinder's resolution of a swearing match unless one of the witnesses testified to something physically impossible or inconsistent with contemporary documents. *See Anderson v. Bessemer City*, 470 U.S. 564, 574–75, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). The ALJ, who apparently disbelieved the plaintiff's recollection of the circumstances leading up to the continuance, did not exceed permissible bounds in accepting testimony of the defendant's witnesses about this exchange. The ALJ is entitled to credit the testimony of those it finds more likely to be correct. *ABF Freight System, Inc. v. NLRB*, 510 U.S. 317, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994); *NLRB v. Walton Manufacturing Co.*, 369 U.S. 404, 406–09, 82 S.Ct. 853, 854–56, 7 L.Ed.2d 829 (1962).

Although not the dispositive factor in our ultimate determination, we find the plaintiff has demonstrated no prejudice in this case nor has she shown that the Board was intransigent. *See generally Hively v. Martin*, 185 W.Va. 225, 406 S.E.2d 451 (1991). We cannot say based on the record before us that the ALJ was "clearly wrong." *Butcher v. Gilmer County Bd. of Educ.*, 189 W.Va. 253, 429 S.E.2d 903 (1993).

## C.

### Sex Discrimination Claim

The plaintiff contends she was the victim of sex discrimination because she received approximately $4,000 less in salary than a comparable male employee, Chriss Kiess, who served as the Board's purchasing agent. The ALJ rejected the contention on two grounds.

 First, the ALJ found the contention was time barred by W.Va.Code, 18–29–4(a)(1), which requires a grievant to file her grievance "within fifteen days following the

occurrence of the event upon which the grievance is based, or within fifteen days of the date on which the event became known to the grievant[.]" The ALJ concluded the salary discrimination claim was not timely filed because the salary gap between the plaintiff and Mr. Kiess was created in 1990 and the plaintiff did not file her grievance until July of 1992. Furthermore, the ALJ rejected the plaintiff's claim that the 1990 Board actions and the 1992 transfer were part of a continuing practice of hostility toward the plaintiff.

■ We do not disturb the ALJ's conclusions that the 1990 and 1992 actions were discrete events, that the plaintiff failed to demonstrate a continuing practice of hostility, and that the plaintiff therefore cannot piggy-back the entirety of her salary discrimination complaint on top of the 1992 transfer decision. Nevertheless, we find the plaintiff's complaint about the discrepancy in salaries is not completely time barred. In *West Virginia Institute of Technology v. West Virginia Human Rights Commission*, 181 W.Va. 525, 534, 383 S.E.2d 490, 499 (1989), we held:

> "Unlawful employment discrimination in the form of compensation disparity based upon a prohibited factor such as race, gender, national origin, etc., is a 'continuing violation,' so that there is a present violation of the antidiscrimination statute for as long as such compensation disparity exists; that is, each paycheck at the discriminatory rate is a separate link in a chain of violations. Therefore, a disparate-treatment employment discrimination complaint based upon allegedly unlawful compensation disparity is timely brought if it is filed within the statutory limitation period after such compensation disparity last occurred."

Although that opinion was decided under the Human Rights Act, W.Va.Code, 5–11–1, *et seq.* (1967), we see no reason not to apply the same analysis to W.Va.Code, 18–29–2 (1992). As a result, the plaintiff's July 1992 grievance was timely filed as to any salary disparity between her and Mr. Kiess that existed within the fifteen-day statutory period preceding the filing of her grievance in July, 1992, and thereafter. The statute of limita-

tions thus restricts the length of the back pay period, but it does not bar the claim entirely. Accordingly, if the plaintiff proved the discrimination, she would have been entitled to be made whole retroactive to June 30, 1992 (fifteen days preceding the filing of the grievance), and to receive prospective relief.

■ That brings us to the ALJ's second reason for rejecting the salary disparity claim: the plaintiff failed to prove her case on the merits. The entirety of the ALJ's findings and conclusion on that issue was:

> "The evidence does not support Grievant's claim that she has received disparate treatment. By her own admission, another employee [Joyce Hutton] was RIFFED and scheduled to receive a salary reduction in excess of $4000 in 1990. That employee would have received exactly the same treatment as Grievant but for the fact that she transferred to another professional position.... [E]ven though intervening factors ultimately left Grievant as the only employee to incur a salary reduction, the Board has apparently never singled her out for disparate treatment."

As we explain below, this conclusion must be set aside as a matter of law.

■ The evidence focused on three employees who were similarly situated in the Board's central administrative office as of the 1989–90 school year: the plaintiff, Ms. Hutton, and Mr. Kiess. Each performed (so far as we can tell) jobs involving comparable levels of skill, effort, and responsibility. Ms. Hutton had been in the Board's employ for eleven years through the 1989–90 year, and the plaintiff and Mr. Kiess each had ten years of service. Ms. Hutton and the plaintiff had education degrees; Mr. Kiess did not. As of 1989–90, their salaries were as follows:

Sarah Martin — $28,494
Joyce Hutton — $29,567
Chriss Kiess — $28,070

At this point, the plaintiff and Ms. Hutton were informed they were to be RIFFED unless they accepted salary reductions. Ms. Hutton then sought and received a teaching position, which permitted her not only to avoid the reduction but also to secure an

increase in salary for the 1990–91 school year. Because she has remained a teacher since then, her salary figures from that point are not relevant. As for plaintiff and Mr. Kiess, their salaries for the relevant years were:

| | 1990–91 | 1991–92 | 1992–93 |
|---|---|---|---|
| Sarah Martin | $25,964 | $25,952 | $26,456 |
| Chriss Kiess | $29,805 | $29,852 | $30,356 |

Thus, the plaintiff showed that in the year she took a pay cut of approximately $2,500, a similarly situated male, Mr. Kiess, received an increase of approximately $1,800, creating a disparity of about $4,000,[8] which has continued through the succeeding years. A plaintiff can establish a *prima facie* case of intentional salary discrimination if she proves that she is a member of a protected class and that she receives a lower salary than an individual who is not a member of the plaintiff's class and who is similarly situated to the plaintiff in terms of experience and the comparability of job content. *See West Virginia Institute of Technology, supra.* The plaintiff has done so. The employer may rebut the inference by coming forward with some legitimate explanation for the salary discrepancy.

The Board argues here, and the ALJ so held, that the plaintiff's inference of discrimination was destroyed by the fact that Joyce Hutton was also slated for a salary reduction. Thus, they reason, the plaintiff was not singled out for discriminatory treatment. The argument fails on its face, however, because Ms. Hutton is also obviously a woman and a member of the plaintiff's protected class. That the Board may have sought to reduce the salary of another woman in addition to that of the plaintiff in no way diminishes the inference from the plaintiff's *prima facie* case that her salary has suffered because of

gender discrimination. If anything, such evidence strengthens the inference. Thus, we hold the ALJ erred as a matter of law by ruling, in effect, that the plaintiff failed to establish an inference of sexually discriminatory treatment.[9]

■ Of course, the plaintiff's success in showing a *prima facie* case does not automatically entitle her to success in her grievance. The employer may rebut the inference by coming forward with some legitimate explanation for the salary discrepancy. In this case, the Board arguably attempted several explanations. First, it offered evidence of budget shortfalls which required it to make corresponding cuts in personnel and payroll. While such evidence clearly shows a legitimate reason, it is not standing alone an explanation for why the plaintiff's salary was cut and Mr. Kiess's salary was increased or why the pay disparity continued into the grievable period (after one more pay cut for plaintiff and two more increases for Mr. Kiess). That other persons working in the central administrative offices also received increases in salary over the period in question further highlights the inadequacy of the defendant's budget woes standing alone as a response to the *prima facie* case and as an explanation for the plaintiff's deflated salary.

■ The Board also proffers that the plaintiff was reclassified from professional to service personnel in 1990 and, as part of her reclassification, she lost salary. Once again, the response standing alone does not explain the relevant salary disparity. A reclassification might justify a salary adjustment if, for example, a collective bargaining agreement or some other pre-set schedule required payment of certain classified workers at certain

---

8. As we explained above, the 1990 pay cut was not timely grieved and the plaintiff cannot now recover for the discrimination, if any, which may have caused the reduction in pay. The events of 1990, however, may be relevant in determining whether the salary discrepancies for the grievable period, which began at the very end of the 1991–92 school year, are the result of discrimination. *See, e.g., International Bhd. of Teamsters v. U.S.,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (the fact of employer's pre-Title VII discrimination may be relevant to determine whether it continued to discriminate after the Act's effective date).

9. In defense of the ALJ, she may have felt precluded by other administrative decisions from considering charges of sex discrimination and was thus left to decide only whether the plaintiff was "singled out." However, our decision in *Vest v. Board of Education of County of Nicholas,* 193 W.Va. 222, 455 S.E.2d 781 (1994), makes clear that an ALJ in the educational employees' grievance process may hear and decide claims of class-based discrimination of the sort that the Human Rights Act forbids.

rates. We are not informed in this case of any such schedule that might have required the reduction of the plaintiff's salary. Moreover, the reclassification could hardly support the disparity that developed between the salaries of the plaintiff and Mr. Kiess because *after* the reclassification, they were both classified as service personnel. It is beyond our understanding how designating the plaintiff as "service personnel" could justify paying her $4,000 less than some other worker who has the same designation and the same number of years of service.

■ In another argument, the Board posits that action taken toward Mr. Kiess in 1989 explained the salary discrepancy. Board employee Shannon Bennett testified at the Level IV hearing that Mr. Kiess received a pay cut in the year preceding the plaintiff's cut. Presumably, a pay cut in one year might make the Board more reluctant to cut the same employee's pay the following year—although that reluctance did not prevent the Board from reducing the plaintiff's salary in both 1990 and 1991. In any event, Ms. Bennett testified later in the Level IV hearing that she did not know the amount of Mr. Kiess's pay cut and, further, that she was not even sure whether he suffered a decrease in salary or simply a change in the manner of calculating his increment. Ms. Bennett stated: "I had a conference with [Mr. Kiess] . . . and he advised me that the year before these other [1989] changes were made his salary was affected." She was not aware of how much his salary was affected, however. The matter received greater attention (although not necessarily greater clarity) at the Level II hearing. The Level II hearing included the following exchange between questioners and Frank E. Deitsch, Director of Finance and the plaintiff's immediate supervisor:

"[Board counsel] MR. HART: . . . [D]id you have any knowledge of . . . Chriss Kiess being discussed as being . . . an individual that might be subject to similar reductions as what Mrs. Martin went through?

"MR. DEITSCH: Um, let me just be candid about this. My understanding of the situation is this. Uh, when I came on board we had Chriss Kiess, Joyce Hutton and Mrs. Martin were paid at the same rate of pay and they were paid, uh, I know some people take exception to this, but they were being paid at, on, uh, Joyce Hutton's degree and experience and they were, uh, at, apparently that situation, that, uh, agreement was set up before I got here by the, by the prior administration. And, so, that's the way they were being paid. They were all paid the same, same rate. And, uh, when, uh, when this change came about in, when was it, 1990, well really 19, I guess July of 1991, 1990, I'm sorry, uh, uh, Mr. Kiess had been, uh, taken off that, it seems to me if I, if I have my dates right, Mr. Kiess was taken off that arrangement the prior, the prior July and he was put on, just as a service personnel. His rate of pay was not changed but he was no longer given the, uh, the professional increments. He was treated as, from that day forward, any other, uh, service personnel. He got whatever increases the service personnel got at that time. So he was separated from the three the prior, prior July.

\* \* \* \* \* \*

"[Plaintiffs' Counsel] MS. MARTORELLA: Okay. Now, at some point in, at some point in 1990, did Sarah Martin receive approximately a four thousand dollar ($4,000.00) salary reduction?

"MR. DEITSCH: Uh, that's yes, approximately, yes.

"MS. MARTORELLA: Did Chriss Kiess ever receive a similar salary reduction?

"MR. DEITSCH: No, no. As I said before, when his, when he was taken off the agreement, his pay remained where it was and he was, from that day forward, given the, uh, service personnel incremental increases.

\* \* \* \* \* \*

"MS. MARTORELLA: Okay. At any time since 1990, has Chriss Kiess gotten a salary reduction of any kind?

"MR. DEITSCH: Not to my knowledge, no.

\* \* \* \* \* \*

"[Superintendent] MR. MARCHIO: Uh, huh. Okay. Now, I'm not sure if I understand what, uh, when you referred to Mr. Kiess's being taken off of the agreement. Maybe you can, you mentioned that a couple times and I'm not real clear about that.

"MR. DEITSCH: Well, what I, when I alluded to the agreement, uh, what I said was that, uh, the three people in the finance department, Joyce Hutton, Mrs. Martin, and Chriss Kiess were being paid at the time I arrived on the scene, uh, the same amount of money each year. They were, it was based on Joyce Hutton's degree and experience.

"MR. MARCHIO: And they all were paid that same amount.

"MR. DEITSCH: That is correct.

"MR. MARCHIO: Okay.

"MR. DEITSCH: That's why you see'em on that sheet. They were all three at the same level.

"MR. MARCHIO: Okay, and what happened?

"MR. DEITSCH: Uh, Mr. Kiess was separated from the group and he was not reduced in pay but on a perspective basis, he was given just, uh, from that day forward, service personnel incremental increases.

"MR. MARCHIO: And the others continued to get the professional increments.

"MR. DEITSCH: No. The other two were, the other two were RIF'd and, when they signed their agreements, their salaries were then changed. They were cut approximately four thousand dollars.

"MR. MARCHIO: Oh. Okay, okay. I didn't understand exactly how that worked."

We, too, have difficulty in understanding this position. As best we can tell, two females and one male were lumped together salary-wise and were receiving the professional personnel incremental increases. The male was removed from the group apparently because he was service personnel and should not have been receiving the professional increments. His salary remained at his then current level, but prospectively he was to receive only service personnel increments. The two women, the Board concluded, had been wrongly classified as professional. They were RIFFED. The Board then made them an offer: they could keep their jobs, but they had to agree to be reclassified as service personnel *and* to take a pay cut. One of the women then left for a different job, and the remaining woman took another, albeit minor, pay cut the following year, while the man got another raise. Needless to say, that is a very strange narrative. And it does not explain, at least in any rational manner, why the plaintiff received a pay cut and Mr. Kiess did not.

■■■ A nonsensical and arbitrary justification for disparate treatment (such as we have here) seriously undercuts an employer's claim that it did not rely on a forbidden motive and tends to show that the purported justification was pretextual. Still, it is possible for an employer to act arbitrarily, but not necessarily on the basis of an illicit motive. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 457 S.E.2d 152 (1995). Because the administrative law judge did not find a *prima facie* case of discrimination, she made no findings regarding the sufficiency of the Board's response or pretext. We, therefore, remand this matter to the circuit court with directions to remand this case to the ALJ to sort through this mess of confusion and make the appropriate findings. We leave it up to the ALJ to decide whether the record is adequate or whether it needs to be supplemented. Upon remand, the ALJ should consider that the plaintiff is not required to show that the defendant's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor of gender was at least one of the "motivating" factors. *See, e.g., Price Waterhouse v. Hopkins*, 490 U.S. 228, 247, 249, 109 S.Ct. 1775, 1788, 1790, 104 L.Ed.2d 268 (1989) (plurality opinion) (where employer has shown a legitimate motive the plaintiff need not show that the prohibited factor was the sole or principal reason, or "the true reason"). If the plaintiff proves by a preponderance of the evidence that an illicit motive entered into the challenged employment decision, then the plaintiff wins unless the defendant proves by a preponderance of

the evidence that the same result would have occurred even in the absence of the illicit motive.

Finally, we believe she should also consider whether the grievance established a claim under the general provision stated in W.Va. Code, 18–29–2, that allows recovery for "any discriminatory or otherwise aggrieved application of unwritten policies or practices of the board[.]" *See Vest v. Board of Educ. of County of Nicholas,* 193 W.Va. 222, 225, 455 S.E.2d 781, 784 (1995) ("[o]bviously, a state education employee who is denied a job benefit solely because of her gender would have a meritorious grievance based on either 'discrimination' or 'favoritism' and also would have a claim for relief under the Human Rights Act").

## D.

### *Misclassification as Service Personnel*

■ The plaintiff contends she has been erroneously classified as service personnel rather than professional personnel. As the ALJ did with the disparate salary claim, she concluded this contention was time barred because the decision to reclassify was made in 1990 and the grievance was not filed until 1992, well past the fifteen-day time period stated in W.Va.Code, 18–29–4(a)(1). We conclude, however, that W.Va.Code, 18–29–2, allows employees to contest a misclassification at any time (although only once). As with a salary dispute, any relief is limited to prospective relief and to back relief from and after fifteen days preceding the filing of the grievance.

■ On the merits, the ALJ found the plaintiff was properly classified under service personnel. On this issue, we have considerable sympathy with both the plaintiff and the Board. The ALJ reasoned, and the Board now argues, that the plaintiff's duties do not meet the statutory definition of "professional personnel" in W.Va.Code, 18–1–1(b) (1981).

That provision states that " '[p]rofessional personnel' shall mean persons who meet the certification and/or licensing requirements of the State, and shall include the professional educator and other professional employees." The plaintiff obviously is neither a teacher nor one of the section's specified administrators. Thus, she could be classified as "professional personnel" only if she meets the definition in W.Va.Code, 18A–1–1(d), of "other professional employee," which refers to a "person from another profession who is properly licensed and is employed to serve the public schools[.]" The Board insists that because the plaintiff's job did not require state certification or licensing she must therefore fall into the classification of "service personnel" contained in W.Va.Code, 18A–1–1(e). This assertion is a reasonable interpretation of the statute. The Board is surely correct when it contends that the fact that the plaintiff has a degree and certification does not make her a professional within the statute. The inquiry must focus on the requirements for the job in question, not on the person who holds the job; a school janitor could be a teacher with a doctoral degree, but he would still not be classified as a professional.

The plaintiff, on the other hand, contends she does not meet the statute's definition of "service personnel," which means "those who serve the school or schools as a whole, in a nonprofessional capacity, including such areas as secretarial, custodial, maintenance, transportation, school lunch, and as aides." W.Va.Code, 18A–1–1(e). She argues the list of examples defines the nature of the class and thus distinguishes between those who work in jobs that do not require expertise, training, a degree, or the exercise of considerable discretion and those who work in jobs with such requirements, *i.e.,* in "professional" jobs, as that term is commonly used.[10] She, therefore, adduced evidence concerning the requirements for and nature of her job, such evidence tending to establish the "profession-

---

**10.** A canon of statutory construction called *noscitur a sociis,* which holds that a word is known by the company it keeps, is pertinent here. *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* —— U.S. ——, ——, 115 S.Ct. 2407, 2411, 132 L.Ed.2d 597, 613 (1995); *Darlington v. Mangum,* 192 W.Va. 112, 450 S.E.2d 809 (1994);

*Banner Printing Co. v. Bykota Corp.,* 182 W.Va. 488, 388 S.E.2d 844 (1989); *Wolfe v. Forbes,* 159 W.Va. 34, 217 S.E.2d 899 (1975). The fact that several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well.

al" nature of her work. This assertion is also a reasonable interpretation of the statute.

Mr. Deitsch conceded the plaintiff's job duties remained basically the same following her transfer from Assistant Finance Officer to Accountant III. He further stated the plaintiff's job duties are in excess of the statutory definition of Accountant III provided in W.Va.Code, 18A–4–8 (1994).[11] Mr. Deitsch also testified the plaintiff's job duties "are of a higher level" than the other Accountant IIIs in the office.[12]

■■■■ Having reviewed the relevant evidence and the legal principles relating to the issue before us, we now come to our analysis. Here, again, we find the factual findings and conclusions of the ALJ are insufficient to permit meaningful appellate review. We begin our analysis with the recognition of a familiar rule of law: "School personnel regulations and laws are to be strictly construed in favor of the employee." Syl. pt. 1, *Morgan v. Pizzino*, 163 W.Va. 454, 256 S.E.2d 592 (1979). It is the duty of the courts to apply the statute in accordance with the legislative intent. *Gant v. Waggy*, 180 W.Va. 481, 377 S.E.2d 473 (1988). The critical concern of the reviewing court is that the ALJ provide a coherent and reasonable explanation of his or her exercise of discretion.[13] Because the ALJ assumed all the claims of the plaintiff were timed barred, she failed to deal with the specifics of the reclassification issue. We, therefore, find it necessary to remand this issue so the ALJ can evaluate all the relevant information. For purposes of remand, we offer the following guidance.

In our judgment, the plaintiff does not neatly fit within the statute's definition of "service personnel" nor does she fall within the clear language of "professional personnel." As we stated above, she could be classified as "professional personnel" only if she met the definition in W.Va.Code, 18A–1–1(d), of "other professional employee," which refers to a "person from another profession who is properly licensed and is employed to serve the public schools[.]" Unfortunately, under our statutory scheme, she. must be either one or the other. Therefore, it becomes necessary for the ALJ to closely analyze the facts and to determine under the law which definition applies.

■■■ "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391, 397 (1992). Ordinarily, when forced to choose between a specific statutory provision dealing with a "professional personnel" and a general listing of jobs from which to infer that a certain job is not included within its provisions, the ALJ should err on the side of the specific provision in the belief that it reflects legislative intent more clearly. Absent a clearly expressed intention that the more specific provision does not control, we do not believe the Legislature intended to undermine this carefully drawn statute limiting "professional personnel" to those that require certification or licensure. We make this observation consistent with our duty to "make sense rather than nonsense out of the corpus juris." *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 101, 111 S.Ct. 1138, 1148, 113 L.Ed.2d 68, 84 (1991). Understandably, we have a deep reluctance to interpret a statutory provision so

---

**11.** W.Va.Code, 18A–4–8, provides the following definition for Accountant III: " 'Accountant III' means personnel who are employed in the county board of education office to manage and supervise accounts payable and/or payroll procedures."

**12.** The transcript of the Level II hearing reflects the following exchange between the plaintiff's attorney and Mr. Deitsch:

"MS. MARTORELLA: ... Alright, would you agree that Ms. Martin's job description requires more by way of independent judgement or discretion, such as that which might be required of an administrator, than the clerical, mail, typing, functions more typical of the other persons classified as accountant III's?

\*　\*　\*　\*　\*　\*

"MR. DEITSCH: Yes, I think, I think her duties are of a higher level than the other ones, yes."

**13.** Legal issues are generally for courts to resolve; however, even in considering such issues, courts are to give some deference to the administrative body's informed decision. *Federal Trade Comm'n v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454, 106 S.Ct. 2009, 2015, 90 L.Ed.2d 445, 454 (1986).

as to render superfluous other provisions of the same enactment.

It is inescapable that the position held by the plaintiff does not require her to possess a teaching certificate or other professional certification. *See Trimboli v. Board of Educ. of Wayne County*, 163 W.Va. 1, 6 n. 2, 254 S.E.2d 561, 563 n. 2 (1979) (" '[p]rofessional personnel' ... are certified or licensed persons"). However, this conclusion does not end the controversy. The ALJ must determine whether under this statutory scheme there are other considerations that must be factored into the equation. The legislature knew that this statute would be closely read by school administrators, school boards and the courts. If the legislature had meant to foreclose all but one intended interpretation, it could have precisely drafted the statute to say so. The statute's lack of precision has left us with language that invites two equally plausible interpretations. Without direct evidence of legislative intent, we are forced to choose one valid interpretation over the other.

 It is by now commonplace that when faced with a problem of statutory construction, the circuit court and this Court should give some deference to the interpretation of the officer who is charged with statutory implementation. As we noted in Syllabus Point 7, in part, of *Lincoln County Board of Education v. Adkins*, 188 W.Va. 430, 424 S.E.2d 775 (1992): " ' "Interpretations of statutes by bodies charged with their administration are given great weight unless clearly erroneous." ' " (Citations omitted). *See also* Syl. pt. 2, *West Va. Dept. of Health and Human Resources/Welch Emergency Hosp. v. Blankenship*, 189 W.Va. 342, 431 S.E.2d 681 (1993); *Boley v. Miller*, 187 W.Va. 242, 418 S.E.2d 352 (1992); *Blennerhassett Historical Park Comm'n v. Public Serv. Comm'n of W.Va.*, 179 W.Va. 250, 366 S.E.2d 758 (1988). Of course, when there is more than one reasonable interpretation, the courts ordinarily should follow that of the administrative board. Adherence to the practice described above is particularly important in cases where the agency has some expertise in making these determinations. Nevertheless, the deference that we speak of has some limitations.

"The policy underlying our grant of special deference to agency decisions and similar agency pronouncements does not extend to every agency action. For example, it does not extend to *ad hoc* representations on behalf of an agency, such as litigation arguments. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213, 109 S.Ct. 468, 474, 102 L.Ed.2d 493, 503 (1988) (little weight should be given to expedient litigation position of an agency)." *Petition of Snuffer*, 193 W.Va. 412, 417, 456 S.E.2d 493, 498 (1995) (Cleckley, J. Concurring).

On remand, the ALJ should consider the above factors in making a determination on this issue.

### E.

#### *Remaining Assignments of Error*

We find the remaining assignment of error is without merit and does not warrant discussion.[14]

### III.

### CONCLUSION

For the foregoing reasons, the judgment of the Circuit Court of Kanawha County is reversed. The circuit court is instructed to remand this case back to the ALJ for action consistent with this opinion.

Reversed and remanded with instructions.

MILLER, Retired Justice, sitting by temporary assignment.

ALBRIGHT, J., did not participate.

---

14. The plaintiff asserts the Board failed to meet certain procedural requirements during the course of the grievance. The ALJ found:

> "Any violation of the procedural requirements of *W.Va.Code* § 18A–2–7 · when the Board failed to notify Grievant of its action by certified mail, but did in fact provide her with actual notification by hand delivery, within the statutory timelines caused Grievant to suffer no harm and will not justify an award of relief."

We do not find the ALJ abused her discretion in failing to award relief on this matter.