515 S.E.2d. 594

**STATE of West Virginia ex rel. YOUTH SERVICES SYSTEMS, INC. a West Virginia Corporation, Petitioner,**

v.

**Honorable Ronald E. WILSON Judge of the Circuit Court of Ohio County and Tracy Galloway, Individually and as Administratrix of the Estate of D'Ominique Galloway, Respondents.**

No. 25444.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 16, 1999.

Decided May 13, 1999.

David L. Wyant, Esq., Shuman, Annand, Bailey, Wyant & Earles, Wheeling, West Virginia, Attorney for Petitioner.

David J. Sims, Esq., Robert G. McCoid, Esq., Sims & McCoid, Wheeling, West Virginia, Attorneys for Respondents.

WORKMAN, Justice.

Youth Services Systems ("Youth Services") seeks a writ of prohibition to prevent enforcement of the ruling[1] issued by the Circuit Court of Ohio County, in which the court found that Youth Services is not a "political subdivision" within the meaning of the Governmental Tort Claims and Insurance Reform Act (the "Act"), West Virginia Code §§ 29–12A–1 to –18 (1999), and is therefore not entitled to immunity from prosecution for a wrongful death action. After closely examining the statutory provisions at issue, we find no error in the lower court's ruling and accordingly, we refuse to grant a writ of prohibition.

I. Factual and Procedural Background

Mrs. Tracy Galloway, Plaintiff below, initiated delinquency proceedings against her fourteen-year-old son, D'Ominique, with the filing of a petition on September 22, 1995, wherein she alleged that D'Ominique was both incorrigible and a runaway.[2] Three days later, D'Ominique was arrested and placed at the Northern Regional Juvenile Detention Facility.[3] Following the detention hearing on September 26, 1995, the circuit court entered an order on September 27, 1995, requiring D'Ominique to remain at the Northern Regional detention facility. The dispositional hearing was held on September 28, 1995, and the circuit court directed that D'Ominique be placed at Olympic Center[4] in

---

1. Two orders were entered in connection with the lower court's ruling. Initially, the court by order dated September 2, 1998, summarily denied the summary judgment ruling. By separate order dated November 17, 1998, the circuit court detailed its reasoning for the ruling. The second ruling was prompted by a letter from Youth Services specifically requesting the court's bases for its ruling.

2. While D'Ominique was housed at the detention center, his mother filed a second petition against him, alleging that he was in possession of crack cocaine with intent to deliver.

3. Youth Services, a non-profit corporation, operates the Northern Regional Juvenile Detention Facility pursuant to a contract with the DHHR.

4. The record fails to describe the nature of this facility.

Kingwood, West Virginia, for inpatient drug and alcohol treatment. Both Mrs. Galloway and the juvenile probation officer agreed to the placement. The dispositional order further provided that D'Ominique was to have a psychological examination while at the Olympic Center. When the Ohio County Juvenile Probation Officer, Susan Mortakis, contacted the Olympic Center, Ms. Mortakis was purportedly told that she had to obtain preapproval[5] from the West Virginia Medical Institute[6] before the Olympic Center could accept D'Ominique. Youth Services claims that when it contacted West Virginia Medical Institute for the necessary approval,[7] it was told that the transfer would not be authorized until a psychiatric evaluation was performed and a treatment plan submitted.[8]

After holding the adjudicatory hearing on October 12, 1995, the circuit court placed D'Ominique on probation for one year.[9] Shortly after his release from the Northern Regional detention facility and while in the custody of his mother, D'Ominique ingested controlled substances and shot himself in the head. He later died as a result of the gunshot wound. Although D'Ominique had been scheduled to have a drug and alcohol evaluation on October 16, 1995, no such evaluation was performed because of his release[10] four days prior to the scheduled evaluation.

Mrs. Galloway instituted a wrongful death suit against Youth Services and West Virginia Medical Institute[11] on February 13, 1997, asserting negligent failure to approve and secure treatment for D'Ominique. On February 12, 1998, Youth Services filed a motion for summary judgment wherein it claimed immunity from suit under the Act. Judge Wilson concluded, following a hearing on the motion, that Youth Services was not a "political subdivision" entitled to immunity under the Act. Seeking to prevent enforcement of the lower court's denial of statutory immunity, Youth Services requests that a writ of prohibition issue.

## II. Standard of Review

We recently set forth the controlling standard of review for writs of prohibition that do not involve a challenge to the lower court's assertion of jurisdiction:

In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests per-

---

5. Although Youth Services takes the position that preapproval was required by West Virginia Medical Institute before Olympic Center would agree to the transfer, Plaintiff asserts that only the preparation of and submission of a specific form—"MCM–1"—was required. Plaintiff asserts that it was the responsibility of Youth Services to complete the MCM–1 form.

6. West Virginia Medical Institute has a contract with the Health Care Financial Administration of the United States Department of Health and Human Services for the purpose of evaluating, monitoring, and approving medical treatment for Medicare recipients. Since D'Ominique was a Medicaid beneficiary, his placement request was required to be submitted to West Virginia Medical Institute for preauthorization approval pursuant to its contract with the United States Department of Health and Human Services.

7. See supra note 5.

8. West Virginia Medical Institute later explained that the psychiatric evaluation was a prerequisite to placement based on D'Ominique's diagnosis of major depression. There is, however, no evidence that D'Ominique was ever diagnosed as suffering from depression.

9. There is nothing in the record indicating why the circuit court seemingly altered its prior position regarding the need to have D'Ominique submit to a drug and alcohol evaluation. The court's decision to place D'Ominique on probation without first securing the evaluation appears inconsistent to this Court.

10. Youth Services observes that no objection was made to D'Ominique's release by his mother, his attorney, the probation officer, or the prosecuting attorney.

11. West Virginia Medical Institute has entered into a settlement agreement with Mrs. Galloway.

sistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syl. Pt. 4, *State ex rel. Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12 (1996). In this case, Youth Services contends that the circuit court's ruling with regard to its entitlement to immunity was clearly erroneous as a matter of law.

### III. Discussion

■ Youth Services bases its argument for immunity on two separate provisions of the Act. The first section concerns immunity for "enforcement of the lawful orders of any court." W. Va.Code § 29–12A–5(a)(3). Youth Services relies secondarily on the statutory immunity extended under the Act for the provision, equipping, lawful operation or maintenance of any prison, jail, or correctional facility. *See* W. Va.Code § 29–12A–5(a)(14). Before we consider the applicability of these immunity provisions, however, there is an initial hurdle that must be met. Since the immunity provisions at issue apply only to political subdivisions, Youth Services must first qualify as a "political subdivision" to invoke statutory immunity.

The term "political subdivision" is defined in West Virginia Code § 29–12A–3(c) as:

any county commission, municipality and county board of education; any separate corporation or instrumentality established by one or more counties or municipalities, as permitted by law; any instrumentality supported in most part by municipalities; any public body charged by law with the performance of a government function and whose jurisdiction is coextensive with one or more counties, cities or towns; a combined city-county health department ...; public service districts; and other instrumentalities including, but not limited to, volunteer fire departments and emergency service organizations as recognized by an appropriate public body and authorized by law to perform a government function: Provided, that hospitals of a political subdivision and their employees are expressly excluded from the provisions of this article.

In its attempt to come within the statutory parameters of a political subdivision, Youth Services looks to the definitional language which references "any public body charged by law with the performance of a government function and whose jurisdiction is coextensive with one or more counties, cities, or towns." In circular fashion, Youth Services suggests that since the youth detention services it provides qualify as a government function, it necessarily follows that it is a "public body charged by law" to perform such governmental services. Concerning the critical issue of whether it is a public body, Youth Services acknowledges that the term "public body" is not defined within the Act and then proceeds to a completely distinct statutory enactment to locate a favorable definition of such term. Citing the definition provided in the West Virginia Freedom of Information Act ("FOIA"), West Virginia Code §§ 29B–1–1 to –7 (1998), Youth Services appropriates the closing catchall FOIA language that defines a "public body" as "any other body which is created by state or local authority or which is primarily funded by the state or local authority." W. Va.Code § 29B–1–2(3). Glossing over significant analytical obstacles, Youth Services concludes that because it gets most of its money from the DHHR and because DHHR is statutorily authorized to provide services for juvenile offenders,[12] Youth Services therefore qualifies as a public body under the FOIA definition of such term. Having qualified itself as a public body, Youth Services concludes that it therefore comes within the Act's definition of a political subdivision based on its provision of a governmental function. *See* W. Va.Code § 29–12A–3(c).

■ Dismantling the argument constructed by Youth Services, Plaintiff contends that

---

12. *See* W. Va.Code 49–5B–4(b), (c) (1998).

Youth Services' reliance on the Act is misplaced as the definition of "political subdivision" found in West Virginia Code § 29–12A–3(c) clearly encompasses only governmental entities. As support for its position, Plaintiff cites a principle of statutory construction known as *noscitur a sociis* or " 'a word is known by the company it keeps.' " *Banker v. Banker*, 196 W.Va. 535, 545, 474 S.E.2d 465, 475 (1996) (quoting *Martin v. Randolph County Bd. of Educ.*, 195 W.Va. 297, 311, 465 S.E.2d 399, 413 n. 10 (1995)). The entities expressly identified in the statutory definition of the term "political subdivision" include "county commission," "municipality," "county board of education," "combined city-county health department," and "public service district." W. Va.Code § 29–12A–3(c). Each of these entities, as Plaintiff emphasizes, is clearly governmental in both origin and purpose. Plaintiff contends that this Court's recognition in *Randall v. Fairmont City Police Dep't*, 186 W.Va. 336, 412 S.E.2d 737 (1991), that "[a] 'political subdivision' includes a municipality, a county commission, a county board of education and *certain other local governmental entities*" supports her position that only governmental entities can qualify as "political subdivisions." *Id.* at 341, 412 S.E.2d at 742 n. 3 (emphasis supplied); *see also Cook v. McDowell County Emergency Ambulance Serv. Auth., Inc.*, 191 W.Va. 256, 445 S.E.2d 197 (1994) (equating "public governmental entities" with "political subdivisions").

■ In furtherance of its contention that Youth Services cannot come within the definitional parameters of a "political subdivision," Plaintiff identifies another well-accepted canon of statutory construction, which requires that " 'the words of a statute are to be given their ordinary and familiar significance and meaning.' " *Keatley v. Mercer County Bd. of Educ.*, 200 W.Va. 487, 491, 490 S.E.2d 306, 310 (1997) (quoting *Metropolitan Property and Liab. Ins. Co. v. Acord*, 195 W.Va. 444, 450, 465 S.E.2d 901, 907 (1995)). Citing Black's Law Dictionary, Plaintiff observes that the definition of a political subdivision is "[a] division of the state made by proper authorities thereof, acting within their constitutional powers, for the purpose of carrying out a portion of those functions of state which by long usage and inherent necessities of government have always been regarded as public." Black's Law Dictionary at p. 1043 (5th ed.1979). Since Youth Services is a privately incorporated entity, Plaintiff argues that it clearly is not "a division of the state made by the proper authorities." *Id.* As such, Youth Services cannot come within the customary meaning associated with the term "political subdivision."

Plaintiff finds additional significance in the fact that the terms "private corporations," [13] "contractors," or "independent contractors" are glaringly absent from the delineation of what constitutes a "political subdivision." *See* W. Va.Code § 29–12A–3(c). Moreover, given that the Act expressly excludes both "contractors" and "independent contractors" from the definition of the term "employee," Plaintiff argues that the Legislature cogently stated its intention that independent contractors are not entitled to the immunity provisions extended therein. *See* W. Va.Code § 29–12A–3(a). Since Youth Services is a privately created corporation, Plaintiff maintains that it simply cannot come within the statutory definition of "political subdivision." *See* W. Va.Code § 29–12A–3(c).

Refuting Youth Services' characterization of itself as a political subdivision, Plaintiff suggests instead that Youth Services is an independent contractor. Plaintiff observes that all of the rights and obligations that Youth Services has in connection with its operation of the Northern Regional Detention Facility arise solely from the contract that it entered into with DHHR. Thus, as Plaintiff explains, the status of Youth Services is inextricably tied to that contractual relationship. As further proof of the independent contractor status of Youth Services, Plaintiff looks to the West Virginia Juvenile Offender Rehabilitation Act, West Virginia Code §§ 49–5B–1 to –7 (1979), to suggest that the Legislature clearly envisioned that

---

**13.** Plaintiff readily admits that the Act contemplates that a separately incorporated entity could come within the Act *if* such entity was created by a county or municipal government. *See* W. Va. Code § 29–12A–3(c).

private agencies, such as Youth Services, would operate detention facilities. The statutory provision in effect at the time of D'Ominique's death [14] defined a juvenile facility as "a place . . . [or] institution . . . which is used for the lawful custody and treatment of juveniles *and may be owned or operated by public or private agencies.*" W. Va.Code § 49–5B–3(6) (repealed 1997). Despite the repeal of that particular statutory provision, the Juvenile Offender Rehabilitation Act still provides for private agencies to contract with the DHHR for the purpose of providing services to juvenile offenders. *See* W. Va.Code § 49–5B–4(c) (1997) (stating that DHHR is "authorized to enter into cooperative arrangements and agreements with *private agencies* or with agencies of the state and its political subdivisions to effectuate the purpose of this article") (emphasis supplied). Plaintiff maintains that Youth Services undeniably typifies a private agency of the sort that the Legislature fully contemplated and authorized to provide juvenile services. *See id.*

Based on the foregoing arguments, Plaintiff maintains that because Youth Services is an independent contractor incapable of meeting the definition of a "political subdivision," the Act's immunity provisions do not apply. We agree. Notwithstanding the sophistic attempts of Youth Services to find legislative authorization for its existence, the fact remains that the Legislature did not affirmatively act to create Youth Services. Contrariwise, Youth Services is simply an ordinary private corporation whose incorporation resulted through the same magisterial means as hundreds of other West Virginia corporations. The contention of Youth Services that its provision of legislatively-authorized services recasts its corporate status to that of "political subdivision" is simply untenable. Similarly fallacious is Youth Ser-

vices' complementary position that by virtue of its receipt of the majority of its funds from DHHR, its private corporation status is converted to that of a public body.[15] *See also 4–H Road Community Ass'n v. West Virginia Univ. Found., Inc.,* 182 W.Va. 434, 388 S.E.2d 308 (1989) (holding that university foundation was not a "public body" subject to FOIA because it was formed by private citizens pursuant to general corporate laws; no legislative mandate predated its incorporation; its location was not on state property; it did not utilize state employees; and selection of its board of directors, as well as their duties, was governed by corporate by-laws). Accordingly, we hold that a private corporation that enters into a contract with an agency of this State for the provision of juvenile detention services does not meet the definition of a "political subdivision" under the Act and is therefore not entitled to the immunity provisions set forth in the Act.

Since Youth Services is not a political subdivision, it cannot invoke the immunity provisions set forth in the Act.[16] Based on our conclusion that Youth Services has failed to demonstrate that the lower court's ruling was clearly erroneous as a matter of law, we determine that Youth Services is not entitled to a writ of prohibition. *See Berger,* 199 W.Va. at 14–15, 483 S.E.2d at 14–15, syl. pt. 4. Accordingly, the writ of prohibition sought by Youth Services is hereby denied.

Writ denied.

---

**14.** Although this statutory provision was repealed in 1997, it clearly was in effect at the time of the incident which precipitated the wrongful death suit.

**15.** If this proposition was true, we can think of numerous entities who could join Youth Services in claiming they, too, are entitled to immunity under the Act because of their receipt of significant government funding and their provision of

services which are, arguably, governmental in nature.

**16.** Because we determine that Youth Services does not qualify as a "political subdivision" under the Act, we do not address its entitlement to immunity under the specific statutory provisions upon which it relied. *See* W. Va.Code 29–12A–5(a)(3), (14).