470 S.E.2d 162

STATE of West Virginia ex rel. Thornton COOPER, Petitioner Below, Appellee,

v.

Honorable Gaston CAPERTON, Governor of the State of West Virginia; Honorable Larrie Bailey, Treasurer of the State of West Virginia; and the Honorable Ken Hechler, Secretary of State of the State of West Virginia, Respondents Below, Appellees.

STATE of West Virginia ex rel. the WEST VIRGINIA WATER DEVELOPMENT AUTHORITY, Petitioner Below, Appellee,

v.

The WEST VIRGINIA INFRASTRUCTURE AND JOBS DEVELOPMENT COUNCIL, Respondent Below, Appellant, Thornton Cooper, Intervenor Below, Appellee.

No. 23059.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 28, 1995.

Decided Feb. 29, 1996.

Thornton Cooper, South Charleston, Pro Se.

Paul E. Jordan, Senior Assistant Attorney General, Joy M. Cavallo, Assistant Attorney General, Charleston, for Appellees Governor Caperton, Treasurer Bailey, and Secretary of State Hechler.

James K. Brown, Jackson & Kelly, Charleston, for Appellee The West Virginia Water Development Authority.

Thomas J. Gillooly, Charleston, for Appellant The West Virginia Infrastructure and Jobs Development Council.

CLECKLEY, Justice:

This opinion follows the December 14, 1995, order issued by this Court affirming the August 30, 1995, order of the Circuit Court of Kanawha County. In its 67–page order, the circuit court granted a petition for a writ of mandamus filed by the West Virginia Water Development Authority (Authority),[1] an appellee herein, demanding that the West Virginia Infrastructure and Jobs Development Council (Council),[2] the appellant herein, be ordered to provide the requisite certification to the Authority and the Treasurer of the State of West Virginia, the Honorable Larrie Bailey, also an appellee herein, so that the marketing and sale of certain general obligation bonds may proceed. The Council then brought this appeal seeking a final judicial determination by this Court.

In that same order, the circuit court also denied a petition for a writ of mandamus by Thornton Cooper originally filed against the

---

1. The Authority and its responsibilities are established in W.Va.Code, 20–5C–1, *et seq.*

2. The Council was created and given authority in 1994 pursuant to W.Va.Code, 31–15A–1, *et seq.*

Honorable Gaston Caperton, Governor of the State of West Virginia; the Honorable Larrie Bailey, Treasurer of the State of West Virginia; and the Honorable Ken Hechler, Secretary of State of the State of West Virginia, also appellees herein. Mr. Cooper challenges the constitutionality of the underlying amendment authorizing the issue and sale of the bonds. After carefully reviewing the facts and legal issues involved in this case, we affirm the circuit court's order.

## I.

### FACTUAL AND PROCEDURAL HISTORY

Initially, Mr. Cooper and the Authority filed independent mandamus actions with this Court on April 7, 1995, and April 13, 1995, respectively. We rejected both petitions without prejudice. Subsequently, both parties filed separate actions in the Circuit Court of Kanawha County. Mr. Cooper intervened in the Authority's suit and, on May 30, 1995, filed a motion to consolidate the two actions. Finding there existed common issues of law and fact between the two cases, the circuit court granted Mr. Cooper's motion.[3] After the circuit court entered its final

order on August 30, 1995, the Council appealed for a determination by this Court. The parties stipulate to many of the facts.

This case involves the "Infrastructure Improvement Amendment" (Amendment) that was placed on the ballot for voter approval in the general election held on November 8, 1994. The duly canvassed and certified votes from that election reflect that the Amendment was ratified by the voters by a margin of 191,373 votes favoring the Amendment to 186,224 votes rejecting the Amendment.

Mr. Cooper, who is a citizen, taxpayer, and lawyer in Kanawha County, opposed the Amendment.[4] Following the election, Mr. Cooper learned that the full text of the Amendment was not published in any newspaper in the State prior to the election as is required by Section 2 of Article XIV of the West Virginia Constitution.[5] Instead, the Secretary of State's Office directed one newspaper in each county to publish a legal advertisement listing the title of the proposed Amendment, the number assigned to the proposed Amendment, and the legislatively adopted "Summary of Purpose" of the proposed Amendment.[6] This information

---

**3.** Apparently, the cases were assigned to different circuit judges. Mr. Cooper's action was assigned to the Honorable Herman G. Canady, Jr., while the Authority's action was assigned to the Honorable Tod J. Kaufman. The consolidated case was presented to Judge Canady.

**4.** Mr. Cooper claims that prior to the election he chaired the Bipartisan Organization Against Rising Debt, the only political committee opposed to the Amendment that was registered with the Secretary of State's Office. Mr. Cooper further asserts that his organization only spent $65.40, plus in-kind contributions, promoting its position. On the other hand, he maintains that the West Virginians for Clean Water and Jobs had a total of $265,607.39 in expenditures and unpaid bills, plus in-kind contributions, promoting ratification of the Amendment.

**5.** In relevant part, Section 2 of Article XIV states:

"Any amendment to the Constitution of the State may be proposed in either house of the legislature at any regular or extraordinary session thereof; and if the same, being read on three several days in each house, be agreed to on its third reading, by two thirds of the members elected thereto, the proposed amendment, with the yeas and nays thereon, shall be entered on the journals, and it shall be the duty

of the legislature to provide by law for submitting the same to the voters of the State for ratification or rejection, at a special election, or at the next general election thereafter, *and cause the same to be published, at least three months before such election in some newspaper in every county in which a newspaper is printed.* If a majority of the qualified voters, voting on the question at the polls held pursuant to such law, ratify the proposed amendment, it shall be in force from the time of such ratification, as part of the Constitution of the State." (Emphasis added).

**6.** With respect to creating a summary of purpose and a title designating a number to a proposed amendment, the Legislature's and Secretary of State's responsibilities are set forth in W.Va. Code, 3–11–2 (1972), which states, in part:

"In any joint resolution proposing an amendment to the West Virginia constitution, for ratification or rejection by the voters, the Legislature shall for convenience of reference thereto, assign a title to such proposed amendment and shall set forth a summary of the purpose of such proposed amendment. If the Legislature shall fail in any such resolution to include a title and summary, or either, the secretary of state shall supply such omission or

was published in 54 of the 55 counties in West Virginia.[7]

The circuit court found that at least as early as 1989 and perhaps as early as 1982 the Secretary of State generally ceased directing that the full text of amendments be published in newspapers across the State.[8] Due to the failure to publish the full text of the Amendment, Mr. Cooper announced that he would challenge the Amendment which created concern over the marketing and sale of the bonds. Therefore, the Council states it declined to "certify the amount to be retained for payment of principal and interest on bonds to be issued pursuant to the Amendment, pending a judicial ruling on the legality and constitutionality of the Amendment, and of the related legislation." As a result of these circumstances, the two actions below were filed—one by the Authority seeking certification from the Council, the other by Mr. Cooper challenging the Amendment.

## II.

## DISCUSSION

Mr. Cooper, as an appellee,[9] cross-assigns error in no fewer than fourteen iterations. However, we find this appeal boils down to one question: Whether the circuit court erred by concluding that the publication of the "Summary of Purpose" of the proposed

> omissions, and certify the same to the ballot commissioners of each county. Whether set forth in such resolution or certified by the secretary of state, it shall be the duty of the ballot commissioners in each county to place upon the official ballot at the election at which such proposed amendment is to be voted upon, or upon the ballot label in counties where voting machines are used, the title and summary of such proposed constitutional amendment.
>
> "The Legislature may, in the joint resolution, give a proposed amendment a number. If this is done, and if there is more than one amendment submitted at the same election, the position of such amendment on the ballot shall be in accordance with the number so designated. When numbers are not so designated by the Legislature, the secretary of state, in certifying the election ballot, shall number the amendments consecutively in accordance with the dates of their final submission by the Legislature."

Amendment rather than the full text of the Amendment was in substantial compliance with the West Virginia Constitution? After careful perscrutation of both the record and the rich variety of challenges marshalled by Mr. Cooper and the Council, we affirm.

## A.

### Standard of Review

██ Generally, this Court reviews findings of fact for clear error and conclusions of law *de novo*. However, ostensible "findings of fact," which entail the application of law or constitute legal judgments which transcend ordinary factual determinations, must be reviewed *de novo*. In note 5 of *Appalachian Power Co. v. State Tax Department of West Virginia*, 195 W.Va. 573, 582, 466 S.E.2d 424, 433 (1995), we suggested that "mixed questions of law and fact, like pure questions of law, or those involving statutory interpretations, are most often reviewed *de novo*. Most significantly, the sufficiency of the information presented at trial to support a finding that a constitutional predicate has been satisfied presents a question of law." (466 S.E.2d at 433).

██ That the original proceeding was based upon petitions for writs of mandamus does not require us to change our standards of review. In our recent decision of *Staten v.*

> *See also* W.Va.Code, 3-11-4 (1972) (the title of an amendment and the summary of purpose is to be placed on the ballot).
>
> 7. Although it was averred that the Secretary of State's Office mailed to a newspaper in each county a legal advertisement relating to the Amendment, publication did not occur in Greenbrier County.
>
> 8. The circuit court also found: "Since 1982, twenty-five amendments to the Constitution—with only the summary of purpose being published—have been proposed to the voters of West Virginia for ratification or rejection. Of this number, thirteen have been ratified. Included in this number is the Infrastructure Improvement Amendment[.]"
>
> 9. This appeal was filed by the Council. We refused Mr. Cooper's motion that the Council's appeal should be dismissed because he was the only party actually aggrieved by the circuit court's decision and, therefore, should be entitled to be the appellant in this matter.

*Dean,* 195 W.Va. 57, 464 S.E.2d 576 (1995), we settled any doubt as to the standard of review for appeals in mandamus actions in West Virginia. In Syllabus Point 1 of *Staten,* we stated: "The standard of appellate review of a circuit court's order granting relief through the extraordinary writ of mandamus is *de novo.*" Thus, we consider *de novo* whether the legal prerequisites for mandamus relief are present. *See Azurin v. Von Raab,* 803 F.2d 993, 995 (9th Cir.1986), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3264, 97 L.Ed.2d 763 (1987); *Marquez–Ramos v. Reno,* 69 F.3d 477, 479 (10th Cir.1995). By adopting a *de novo* standard of review, we give adherence to the notion that an appellate court's standard of review should depend upon "the respective institutional advantages of trial and appellate courts," not upon what standard of review will produce a particular substantive result. *Salve Regina College v. Russell,* 499 U.S. 225, 233, 111 S.Ct. 1217, 1222, 113 L.Ed.2d 190, 199 (1991). Moreover, in *Randolph County Board of Education v. Adams,* 196 W.Va. 9, 14, 467 S.E.2d 150, 155, (1995) we stated: "Most importantly, the issue presented in this appeal is a matter of construction of our Constitution and mandates *de novo* review by this Court." Our review of the circuit court's order is plenary in all respects because its decision interpreted, on stipulated facts, a provision of our Constitution.

### B.

*Preliminary Procedural Issues*

■ Before turning to the substantive issues, we address briefly two problems raised by Mr. Cooper. First, he complains that the circuit court adopted nearly verbatim the proposed findings of his opponent. Verbatim adoption of proposed findings and conclusions of law prepared by one party is not the preferred practice, *see South Side Lumber Co. v. Stone Constr. Co.,* 151 W.Va. 439, 152 S.E.2d 721 (1967) (findings of fact *should* represent trial judge's own determination), but it does not constitute reversible error. *See, e.g., Freeman v. Poling,* 175 W.Va. 814, 824, 338 S.E.2d 415, 425 (1985); *E.E.O.C. v. Federal Reserve Bank of Richmond,* 698 F.2d 633, 641 (4th Cir.1983), *rev'd on other*

*grounds sub nom. Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). Rather, "even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 572, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 527 (1985). *See also United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 615 n. 13, 94 S.Ct. 2856, 2866–67 n. 13, 41 L.Ed.2d 978, 992 n. 13 (1974). When viewed collectively, the above cases send a clear message: As an appellate court, we concern ourselves not with who prepared the findings for the circuit court, but with whether the findings adopted by the circuit court accurately reflect the existing law and the trial record.

Although Mr. Cooper asserts that he raises factual claims on appeal, virtually all Mr. Cooper's arguments are essentially challenges to the circuit court's legal findings and so are subject to our *de novo* review. *See Dunning v. Barlow & Wisler, Inc.,* 148 W.Va. 206, 211, 133 S.E.2d 784, 788 (1963) (circuit court's conclusions of law are not binding on this Court). Furthermore, we note that the circuit judge in this case did not announce a decision prior to the submission of proposed findings of fact and conclusions of law. In this important respect, the circuit judge followed the recommended procedure in federal cases involving proposed findings of fact and conclusions of law. *See Lilly v. Harris–Teeter Supermarket,* 720 F.2d 326, 332 (4th Cir.1983), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 539 (1984). Accordingly, we find no irregularity in the procedure followed by the circuit court.

■ Second, Mr. Cooper argues that he was precluded from presenting evidence in support of his petition. We find the claim lacks merit. While few rights are more fundamental than that of a litigant to present witnesses in support of his or her case, this right does not require the circuit court to waste its time listening to immaterial or irrelevant evidence. *See* W.Va.R.Evid. 401 and 402; Syl. pt. 3, *Bennett v. Adkins,* 194 W.Va. 372, 460 S.E.2d 507 (1995) (subjective state of mind evidence is "largely immaterial

to the mandamus proceeding"). *See also Doe v. United States*, 666 F.2d 43, 47 (4th Cir.1981) (a party "is not constitutionally entitled to present irrelevant evidence"). It is highly questionable whether the specific evidence proffered by Mr. Cooper would have been of more than marginal utility and minor probative value.[10] Even if error exists, we will not overturn a ruling or decision if we find the error was harmless. *See* W.Va. R.Evid. 103(a); *Reed v. Wimmer*, 195 W.Va. 199, 209, 465 S.E.2d 199, 209 (1995). Sound judicial policy, however, counsels us against deciding this relatively difficult issue of whether Mr. Cooper's evidence could overcome a harmless error defense because a clear, principled, alternative basis exists that disposes of his argument. Thus, we proceed to further dimension.

We have spent a considerable and undue amount of time seeking a clear path through this morass in a futile attempt to determine what effort was expended by Mr. Cooper to assert a right to an evidentiary hearing. He contends he made a sufficient request for an evidentiary hearing prior to the circuit court's ruling on the merits. We find that although Mr. Cooper filed pretrial motions for an evidentiary hearing, he did not meaningfully pursue the motions at the critical time.

It appears that Mr. Cooper's desire to have an evidentiary hearing first was discussed at a hearing held on May 10, 1995, before Judge Kaufman. The intended purpose of that hearing was to rule on Mr. Cooper's motion to intervene in the action brought by the Authority.[11] When Mr. Cooper raised the issue of scheduling an eviden-

tiary hearing at which he possibly would call voters to testify, Judge Kaufman informed Mr. Cooper that he would not allow voters to testify about what they intended. Later, however, Judge Kaufman stated that Mr. Cooper could file motions on that issue if he was permitted to intervene in the case.

As previously mentioned, Mr. Cooper was permitted to intervene in the Authority's action. Thereafter, by order signed by Judge Canady on June 21, 1995, the Authority's action was consolidated with the action originally brought by Mr. Cooper. After consolidation, on June 30, 1995, Mr. Cooper filed a "RENEWED MOTION ... TO CALL WITNESSES," in which he explicitly stated that he did not desire a hearing on this motion. The Authority filed its opposition to this motion on July 7, 1995.

Meanwhile, on July 3, 1995, Mr. Cooper filed a second motion requesting that the "briefing schedule ... be suspended until an evidentiary hearing" could be held "on the issues of why, when, by whom, and at whose direction text from the daily Senate Journal for Friday, March 18, 1994, ... was altered before it was set forth in the bound session volume for the same date." By order entered on July 10, 1995, Judge Canady stated:

"ALL PARTIES to these consolidated cases, having conferred by telephone conference following the filing on July 3, 1995, of the 'Motion by Thornton Cooper to Suspend Briefing Schedule, etc.,' have resolved the question raised in that motion by stipulating to the inclusion of additional exhibits in the parties' Joint Exhibits, to be filed herein. In view of the delay occa-

10. As best we can tell, Mr. Cooper wanted to call witnesses to explain how they were mislead by the State's failure to publish the full text and how their misunderstandings compounded other voters' confusion. While such testimony may be relevant in determining whether the State's action was misleading, the testimony is entitled to little weight. In deciding whether the State in this case substantially complied with Article XIV, *see* Part D, *infra*, a court must determine, under an objective standard, whether the published summary could have mislead or confused a reasonable voter. If Mr. Cooper can identify and produce reasonable persons who can testify that they were mislead, then a court may consider that in deciding whether the objective standard has been satisfied. That there may have been

some confused voters, however, does not prevent a court from comparing the proposed amendment with the published summary and concluding that the latter sufficiently described the full text such that a reasonable voter would not be mislead or confused. The best evidence regarding that conclusion will necessarily be the two documents in question. Indeed, a court would not commit error by excluding all testimonial evidence if the court properly had concluded that the summary was not, on its face, reasonably susceptible to an interpretation that could render it misleading or confusing.

11. *See* note 3, *supra*.

sioned by he change in the Joint Exhibits, the parties have further agreed to again alter the briefing schedule to permit additional time for the filing of briefs[.]"

Apparently, the circuit court did not rule on the June 30, 1995, motion, and the parties proceeded with briefing the merits of the case. Mr. Cooper did not object or move for an evidentiary hearing after it became clear that the circuit court was deciding the case on the merits without affording him an opportunity to present witnesses in support of his contentions. Moreover, at oral argument before this Court, the parties stated that, after the circuit court received the proposed findings of fact and until this appeal, Mr. Cooper remained silent as to his desire to present witnesses.

 To preserve an issue for appellate review, a party must articulate it with such sufficient distinctiveness to alert a circuit court to the nature of the claimed defect. The rule in West Virginia is that parties must speak clearly in the circuit court, on pain that, if they forget their lines, they will likely be bound forever to hold their peace. *See State v. Miller,* 194 W.Va. 3, 17, 459 S.E.2d 114, 128 (1995). The forfeiture rule that we apply today fosters worthwhile systemic ends and courts will be the losers if we permit the rule to be easily evaded. It must be emphasized that the contours for appeal are shaped at the circuit court level by setting forth with particularity and at the appropriate time the legal ground upon which the parties intend to rely.

 Here, Mr. Cooper undermined these mechanisms by not taking the necessary action at a meaningful time to preserve the issue of the lack of an evidentiary hearing.[12] When it became apparent to Mr. Cooper that the constitutional claim was being decided without an evidentiary hearing, he made no objection to the procedure. To the contrary, he conceded at oral argument that because of personal problems he failed to object to the procedure or the findings and conclusions made by the circuit court. Our cases emphasize the need for particular vigilance when asserting rights where a circuit court delayed making a final ruling on a matter. *See State v. Cabalceta,* 174 W.Va. 240, 244, 324 S.E.2d 383, 388 (1984) (finding pretrial motion was "abandoned" by failure to pursue the issue). In *Tennant v. Marion Health Care Foundation,* 194 W.Va. 97, 115, 459 S.E.2d 374, 392 (1995), we addressed a similar procedural issue:

> "[W]e refuse to impose on the trial courts of this state a monitoring requirement after an *in limine* order has been entered. Counsel for litigants have the responsibility for bringing any violations to the court's attention. Without generalizing too broadly, it is normally the case that this kind of monitoring is the job of counsel and not an already burdened circuit judge. In *Waldron v. Waldron,* 73 W.Va. 311, 317, 80 S.E. 811, 814 (1913), we stated a trial judge engrossed in many matters and points pertaining to a case of the magnitude of this one should be aided by the vigilant assistance of counsel: 'If a party who has made an objection permits it to be forgotten, a waiver should be chargeable to the party.'"

This procedural defect requires us to reject Mr. Cooper's claim. Thus, based on this somber record of inattention, we hold that Mr. Cooper forfeited the claim of procedural errors he now espouses.

## C.

### The Need For Judicial Oversight

Respected authorities have called for judicial deferral to the political branches re-

---

12. We do not suggest that a party is required to repeat pretrial requests, motions, or objections that have been ruled upon following a circuit court's announcement of judgment if the reasons for the requests, motions, or objections remained clear after the judgment is pronounced. In this case, the circuit court never gave a definitive ruling but left the issue open for later development. Mr. Cooper did not renew his request for an evidentiary hearing or formulate a new objection at that time; thus, the circuit court may have thought that either the earlier request was abandoned or Mr. Cooper acquiesced in the final result without the need for further development. Nevertheless, we observe that this type of appeal can be avoided if a circuit court after announcing its findings asks counsel whether there are any requests, motions, or objections that have not been ruled upon in the record.

garding the meaning and adequacy of constitutional amendment procedures. *E.g., Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) (the validity of ratification vote on a proposed federal amendment is a political question); *Coleman,* 307 U.S. at 459, 59 S.Ct. at 984, 83 L.Ed. at 1399 (Black, J., concurring) (same; all questions relating to amendment procedures are nonjusticiable); Laurence H. Tribe, *A Constitution We Are Amending: In Defense of a Restrained Judicial Role,* 97 Harv.L.Rev. 433 (1983); *but see* Walter Dellinger, *The Legitimacy of Constitutional Change: Rethinking the Amendment Process,* 97 Harv.L.Rev. 386 (1983). Much of the concern expressed about judicial involvement in the amendment process has focused on the particularly vague provisions of Article V of the United States Constitution and the corresponding lack of judicially manageable standards. The call for restraint also stems from concerns about the system of checks and balances; that is, in a constitutional system in which courts have, in most critical respects, the final say in interpreting the fundamental law and the power to invalidate the actions of the political branches,[13] it is ill-advised for courts to assume the power to review the validity of the only procedures available for popularly overturning a judicial interpretation of the constitution.[14]

Although we find merit in these positions, we do not find them controlling in this case. For one, the amendatory process procedures contained in Section 2 of Article XIV of our state constitution are considerably more specific than Article V of the federal constitution. Accordingly, we are not called upon here to engage in a completely open-ended creation of governing standards. Indeed, state courts generally have exercised the minimal level of constitutional interpretation as we are asked to provide in this case. *E.g., State ex rel. Wenzel v. Murray,* 178 Mont. 441, 585 P.2d 633 (1978); *Opinion of the Justices,* 267 Ala. 666, 104 So.2d 696 (1958). Moreover, the present case does not require us to answer the question of whether the fact that a challenged referendum "overruled" one of this Court's prior decisions should cause us to exercise greater restraint in ruling on the validity of that vote. We believe a judicial ruling on the merits of the Article XIV question provides the finality that is needed.[15]

 We, therefore, conclude that review of the validity of the present Amendment is appropriate. Such review is consistent with the proper role of courts in helping to ensure that the political processes are operating properly and that they do, in fact, permit the expression of the will of the people without undue discrimination against minorities. *See, e.g., Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (requiring one-person-one-vote apportionment to ensure equal representation); *Sturm v. Henderson,* 176 W.Va. 319, 342 S.E.2d 287 (1986)[16] (right to seek political office is a fundamental right); *see generally* John Hart Ely, *Democracy and Distrust* (1980). By policing the political processes, this Court promotes democratic decision-making and majoritarian values. Illustrative of this judicial function and most pertinent to this case is *State ex rel. Smith v. Gore,* 150 W.Va. 71, 143 S.E.2d 791 (1965), which struck down legislation calling

---

13. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). The power of judicial review of the constitutionality of legislation expressly is conferred on this Court by Section 3 of Article VIII of the West Virginia Constitution which states, in part: "The [Supreme Court of Appeals] shall have appellate jurisdiction ... in cases involving personal freedom or the constitutionality of a law."

14. Tribe, 97 Harv.L.Rev. at 435, states: "Among [the vices of judicial review of amendment procedures] is the danger ... of having the Supreme Court closely 'oversee the very constitutional process used to reverse [its] decisions.'" (Citation omitted).

15. Millions of dollars in State-issued bonds hang in the balance on the validity of the Amendment and, thus, on this Court's reaching the merits. Due to the impact uncertainty can have on a bond issuance, we would like to avoid the confusion that exists about whether, for example, the United States Constitution now has a 27th Amendment (amendment, introduced in 1789, did not receive three-fourths ratification from the state legislatures until 1992).

16. Superseded by constitutional amendment as stated in *Adkins v. Smith,* 185 W.Va. 481, 408 S.E.2d 60 (1991).

for election of delegates to a constitutional convention because the law failed to satisfy the equal apportionment requirement in Section 4 of Article II of the West Virginia Constitution. Justice Caplan's opinion for the Court emphasized both the crucial role of popular sovereignty in formulating amendments to, or rewrites of, our fundamental law and the corresponding need to ensure that citizens have a right to participate in that process on an equal basis. Similarly, such as we face in this appeal and as more fully developed below, this Court also has decided challenges to Article XIV's amendment process. In doing so, we have recognized the importance of giving effect to already stated expressions of the popular will. *E.g., Herold v. Townsend,* 113 W.Va. 319, 321, 169 S.E. 74, 75 (1933).

█ In the present case, we have an expression of the voters' desire and a challenge to that vote based on a theory that respondents did not meet their constitutional duty to inform citizens adequately about the subject of their vote. We believe that *Gore* and *Herold,* as well as other decisions we discuss below, clearly direct judicial oversight of amendment procedures and, further, require us to determine whether the democratic process functioned properly in this particular instance. The issue we must decide is clearly justiciable; its resolution can be accomplished by the application of previously developed, judicially manageable standards without risking undue constitutional strain or interbranch conflict. Accordingly, we proceed with the issue of whether the procedures used to enact the Amendment were sufficient to satisfy Article XIV and produced a true expression of the people's will.

### D.

#### The Failure To Publish

The Secretary of State's Office is required to publish the full text of a proposed amendment in newspapers throughout this State

17. *See* note 5, *supra.*

18. In part, W.Va.Code, 3–11–3, provides: "The secretary of state shall cause each proposed amendment, with its title and summary of pur-

pursuant to Section 2 of Article XIV of the West Virginia Constitution [17] and W.Va.Code, 3–11–3 (1972).[18] The full text of the Amendment at issue in this case provides:

"I. The Legislature shall have power to authorize the issuing and selling of state bonds not exceeding in the aggregate three hundred million dollars, which shall be in addition to all other bonds heretofore authorized. The proceeds of said bonds hereby authorized to be issued and sold shall be used and appropriated solely for the construction, extension, expansion, rehabilitation, repair and improvement of water supply and sewage treatment systems and for the acquisition, preparation, construction and improvement of sites for economic development in this state in a manner and subject to such conditions, qualifications and requirements as shall be prescribed by general law. Such bonds may be issued and sold at such time or times and in such amount or amounts as the Legislature shall authorize. When a bond issue as aforesaid is authorized, the Legislature shall, at the same time, provide for the irrevocable dedication, prior to the application of such tax proceeds for any other purpose, of an annual portion of any gross receipts tax which is then currently imposed on businesses that sever, extract and, or produce natural resources within this state which will be sufficient to pay, as it may accrue, the interest on such bonds and the principal thereof, within and not exceeding thirty years and all such taxes so levied and the additional tax hereinafter described shall be irrevocably dedicated to such purpose until such principal and interest on such bonds are finally paid and discharged: *Provided,* That when a bond issue as aforesaid is authorized, the Legislature shall at the same time provide for the collection of an additional annual state tax sufficient to pay as it may accrue the interest on such bonds and the principal thereof within and not exceeding thirty years: *Provided, however,* That such addi-

pose, to be published as a Class I legal advertisement at least three months before such election in *some newspaper in every county in the state in which a newspaper is printed.*"

tional tax shall be levied in any year only to the extent that the moneys from the tax previously dedicated herein are insufficient therefor. Any of the covenants, agreements or provisions in the acts of the Legislature levying and dedicating such taxes shall be enforceable in any court of competent jurisdiction by any of the holders of the bonds.

"II. The Legislature shall have power to enact legislation to implement the provisions of this amendment."

As previously mentioned, over the past several years, the Secretary of State's Office generally has not published the full text of proposed amendments but, instead, has published the "Summary of Purpose." [19]

The "Summary of Purpose" of the present Amendment adopted by the Legislature and published in the newspapers states:

"To allow the issuing and selling of not more than three hundred million dollars in general obligation bonds of the state, the proceeds of which will be used (1) to finance the construction and improvement of water systems and (2) to finance sewage systems and the acquisition and improvement of economic development sites in this state; to dedicate as the initial source of repayment of the principal of and interest on the bonds, a portion of the existing gross receipts tax on the activity of severing, extracting or producing natural resources, and providing for the levy of additional taxes sufficient to pay such bonds to the extent that the amounts dedicated as aforesaid are insufficient therefor."

Mr. Cooper asserts not only that the complete failure to publish the actual text of the Amendment makes the adoption of the Amendment *per se* invalid, but he also maintains that the published "Summary of Purpose" language mislead, misinformed, and failed to inform the voters as to the actual contents of the Amendment.

 As we stated in our prior order, entered on December 14, 1995, this Court has interpreted Section 2 of Article XIV on three prior occasions. *State ex rel. Smith v. Kelly,* 149 W.Va. 381, 141 S.E.2d 142 (1965);

*State ex rel. Morgan v. O'Brien,* 134 W.Va. 1, 60 S.E.2d 722 (1948); *Herold v. Townsend,* 113 W.Va. 319, 169 S.E. 74 (1933). Most recently, we set forth the test for analyzing the constitutionality of an amendment challenged on the basis of some irregularity in the publication process in Syllabus Point 5 of *Smith, supra,* which states:

"The self-imposed limitations on the power of the people of the state to amend the Constitution should not be so construed as to defeat the will of the people, when clearly and decisively expressed, on account of a failure to comply literally with the publication requirement contained in Constitution, Article XIV, Section 2, if such publication requirement is complied with substantially, in the absence of any indication of fraud, and in the absence of any indication that the voters were misled, misinformed or uninformed as a consequence of the failure of a literal compliance with such constitutional requirement."

This test, referred to as the "substantial compliance" rule, will permit this Court to uphold a constitutional amendment that was approved by the voters of this State, even if there were some departures from Article XIV in the ratification process, provided there is no evidence of fraud or voter confusion. Syl. pt. 5, *Smith, supra.* As *Smith* implies, and we emphasize, there is no mechanical formula for identifying which deviations from the literal requirements of Section 2 of Article XIV cross the constitutional line. Consequently, we must determine, case by case, whether a particular deviation produced a fair risk of preventing a true expression of the people's will.

Finding substantial compliance, we issued a writ of mandamus in *Smith* against the Treasurer ordering him to implement and effectuate the "Better Roads Amendment," which was ratified by the voters. The validity of the amendment was put at issue because it was not timely published in several counties in accord with the three-month constitutional requirement. In one county, the amendment was not published until twelve days prior to the general election. We found

19. *See* note 8, *supra.*

the untimely publications did not warrant declaring the amendment unconstitutional. We cautioned, however, that the importance of the case and the constitutional difficulty that ensued as a result of "the delay of publication should serve as a solemn reminder of the devastating consequences which might in the future result from a failure to recognize the grave importance of the requirement of publication contained in the constitutional provision involved in this case." 149 W.Va. at 395, 141 S.E.2d at 151.

*Smith* relied upon our previous decision in *Morgan, supra.* In *Morgan*, a proposed, but not yet voted upon, amendment calling for the issuance of bonds for secondary roads was challenged on the ground that it was not published until "about four weeks after the date on or before which the publication was required by law." 134 W.Va. at 4, 60 S.E.2d at 725. We stated in Syllabus Point 1 of *Morgan*:

> "Though the provision of Section 2, Article XIV of the West Virginia Constitution, requiring a three months' publication of a proposed amendment to the Constitution, is mandatory, such provision is procedural and a substantial compliance therewith is sufficient to base a submission of a proposed amendment to the voters of the State."

We found that the publication, although late, substantially complied with Section 2 of Article XIV and, therefore, denied a motion for a writ of mandamus to be issued against the

Secretary of State to revoke his certification the proposed amendment be submitted to the electorate at the general election.

The first time this Court addressed the publication requirement was in *Herold, supra.*[20] In that case, the Legislature passed the proposed Tax Limitation Amendment on August 6, 1932. For the proposed amendment to be timely published, it was necessary to publish it on or before August 8, 1932, which proved to be an impossible task. 113 W.Va. at 320, 169 S.E. at 75. The amendment was published throughout the State on or before August 13, 1932. 113 W.Va. at 321, 169 S.E. at 75. We found the publication to be in substantial compliance with the Constitution.

We can identify several principles from these decisions. First, the procedures set forth in Section 2 of Article XIV[21] are designed to achieve two goals: (1) to ensure, through the endorsement of a legislative supermajority and the support of a majority of those voting in a statewide referendum, that constitutional amendments reflect a true and broad based political consensus; and (2) to guarantee that such a referendum may be held only after the Legislature has taken steps to inform the electorate fully and accurately about the proposed amendment. Second, and consequently, no amendment to the Constitution can be effected without: (1) the duly recorded concurrence of two-thirds

20. Although Section 2 of Article XIV made significant changes to its antecedent, Section 2 of Article XII of the West Virginia Constitution of 1863, and has itself been amended, the requirement that the proposed amendments be published has been included in each version. The original 1863 text provided:

"Any amendment to the Constitution of the State may be proposed in either branch of the Legislature; and if the same, being read on three several days in each branch, be agreed to on its third reading, by a majority of the members elected thereto, the proposed amendment, with the yeas and nays thereon, shall be entered on the journals, and referred to the Legislature at the first session to be held after the next general election; and *shall be published, at least three months before such election, in some newspaper in every county in which a newspaper is printed.* And if the proposed amendment be agreed to during such session,

by a majority of the members elected to each branch, it shall be the duty of the Legislature to provide by law for submitting the same to the voters of the State, for ratification or rejection. And if a majority of the qualified voters, voting upon the question at the polls held pursuant to such law, ratify the proposed amendment, it shall be in force from the time of such ratification, as part of the Constitution of the State. If two or more amendments be submitted at the same time, the vote on the ratification or rejection, shall be taken on each separately." (Emphasis added).

21. The provisions in Section 2 of Article XIV limit amendments to a single subject or to related subjects and preclude any other matter from being on the ballot when the referendum is voted on at a special election. They also are designed, at least in part, to promote voter awareness and understanding. These provisions, of course, are not implicated in this case.

of the members in each house; (2) the submission of the proposed amendment to the people; (3) the amendment's ratification by a majority of those voting in a statewide referendum; (4) the fulfillment of the legislative duty to inform the people about the proposed amendment through at least substantial compliance with the directives of Section 2 of Article XIV and in a manner "sufficient to permit [the voters] to make up their minds," *Morgan,* 134 W.Va. at 19, 60 S.E.2d at 732; and (5) an absence of evidence that the State's voter education mislead or confused the voters if it was not made in strict compliance with Article XIV. The first three requirements are literal applications of Section 2; the latter two reflect a pragmatic judgment that mere administrative errors in the informational procedures should not be permitted to thwart implementation of an otherwise valid expression of the people's will. These principles are consistent with what we perceive to be the prevailing view among other state courts which have confronted similar issues. *E.g., Opinion of the Justices,* 267 Ala. 666, 104 So.2d 696 (1958); *Opinion of the Justices,* 275 A.2d 558 (Del.Supr.1971); *Buchanan v. Kirkpatrick,* 615 S.W.2d 6 (Mo. 1981); *but see Kremer v. Grant,* 529 Pa. 602, 606 A.2d 433 (1992).

Both courts in Montana and Delaware have addressed the validity of amendments passed after their states failed to publish the full text of the amendments. In *State ex rel. Montana Citizens for the Preservation of Citizens' Rights v. Waltermire,* 227 Mont. 85, 738 P.2d 1255 (1987), the state circulated a summary that had a material defect. For that reason, among several others, the Montana court held the referendum measure to be invalid. In addition, in *Opinion of the Justices,* 275 A.2d 558 (Del.Supr.1971), the Delaware Supreme Court voided an amendment in which the State not only failed to publish the full text, it failed to publish anything, including a summary. The court reasonably concluded "substantial compliance may not be predicated upon no compliance[.]" 275 A.2d at 562. We find the factual differences between the Montana and Delaware cases and this one are significant, and we believe call for a different result.

 Application of the above principles to the present facts reveals that our Amendment is valid. Certainly, two-thirds of the members in each house endorsed the measure; it was submitted to the people; and it received support from a majority of those voting. In addition, the Legislature, through the Secretary of State, had the summary published in a timely fashion in each county, save one. The summary described the Amendment in understandable terms and excluded no material information about the proposal. No reasonable person would have been mislead or confused by the summary.[22] Thus, the voter education was "sufficient to permit [the voters] to make up their minds[.]" *Morgan,* 134 W.Va. at 19, 60 S.E.2d at 732. Finally, we have no probative evidence that there was voter confusion or misunderstanding.[23] We can invalidate the Amendment only if we conclude that the publication of the full text is so critical a deficiency that it is *per se* not substantial compliance. We decline to draw that conclusion. Under the particular facts of this case, involving this Amendment and its summary, we find that publication of the full text would not have enhanced voter enlightenment any

---

**22.** We, therefore, reject Mr. Cooper's contentions that the summary was misleading. The summary speaks for itself and, when compared to the Amendment, its accuracy in capturing the Amendment is patent. Nevertheless, Mr. Cooper argues that the inclusion of the parenthetical numbers in the summary could mislead voters into believing the entire thrust of the Amendment was to finance only water and sewer systems rather than water and sewer systems and economic development. Such a mislead voter, however, would be duped more by his failure to read the literal language of the summary than by clumsy construction. We simply are unwilling to conclude that insertion of the parentheticals "(1)" and "(2)" into the summary render it misleading, thereby, requiring us to overturn a statewide referendum.

**23.** The circuit court also found in paragraph 43 of the August 30, 1995, order that the Amendment was the subject of extensive statewide publicity in the months preceding the election. The publicity included discussions in newspapers around the State, a public television debate, and at least eight town meetings called to inform voters about the Amendment.

more than publication of the summary actually accomplished.

■ We, therefore, hold that the procedures that lead to the passage of the Amendment were sufficient to satisfy Article XIV and create a valid amendment. In so holding, we emphasize that (1) the published summary fully, fairly, and accurately described the Amendment; (2) the summary was, in fact, more understandable than the actual text of the Amendment; (3) the summary was adopted by the Legislature[24]; (4) there was no probative evidence that the summary mislead voters or reasonably could be read to have had a misleading effect; and (5) there was no probative evidence that publication of the full text would have made any difference in the outcome of the referendum. We are wary, too, of holding *per se* invalid a procedure that has been used at least twenty-three times in voting on the past twenty-five proposed amendments of which thirteen of the proposed amendments were enacted.[25]

■ Having so ruled, however, we specifically decline to hold that publication of a summary always will satisfy the substantial compliance standard set forth in our cases. Indeed, because there is a sufficiently great risk that voter manipulation or a significant oversight can occur when the full text is not widely published, we are inclined to strictly review any summary published in lieu of the full text. Moreover, we do not understand why, if Section 2 of Article XIV requires "the legislature to ... cause [the proposed amendment] to be published" in the State's newspapers, the full text was not published. Moreover, all this post-referendum controversy and uncertainty can be avoided if the Article XIV procedures are followed strictly. The directions of the Legislature to the Secretary of State to publish the full text of proposed amendments fulfill the Legislature's obligation to inform the people about any proposed amendment and deserve careful, complete, and timely observance, as in any other case of a ministerial duty imposed by law on a constitutional officer.[26]

We also are cognizant and apprehensive of the fact that in each of our substantial compliance cases there has been progressively less compliance. This trend is not healthy and, if not reversed, eventually will lead to considerable disruption, costs, and controversy when this Court has to overturn the results of a referendum. If the Article XIV procedures now are deemed to be too cumbersome, expensive, or unnecessary, then the solution is to amend the provision—using the proper procedures, of course.

For the foregoing reasons, the decision of the Circuit Court of Kanawha County upholding the validity of the Infrastructure Improvement Amendment hereby is affirmed.[27]

Affirmed.

---

**24.** The Legislature's adoption of the summary is critical for several reasons. As the drafting body of the Amendment, it especially should be well suited to author an accurate summary. In addition, legislators will have the fear of voter retribution if they are found to have mislead their constituents. Finally, legislative adoption of the summary, if done by a two-thirds majority and subsequent statewide publication, means that the summary effectively will have gone through the same procedural prerequisites as Article XIV provides for the full text.

**25.** According to joint exhibit 33 submitted by the parties, the full text of the proposed Uniform School Funding Amendment of 1988 was published. There is no evidence that any publication was made of the proposed Bond Enhancement Amendment of 1988. Neither of these proposed amendments was ratified.

**26.** In fairness to the Legislature, we iterate that it enacted legislation directing the Secretary of State to publish the full text of proposed amendments in the State's newspapers at least three months before the election. W.Va.Code, 3–11–3; note 18, *supra*. In fairness to the current Secretary of State, we should acknowledge that the practice of publishing only the summary was initiated by his predecessor and was approved by an informal opinion from the Attorney General's Office.

**27.** We note that, in addition to the publication issue, a number of other challenges to the validity of the Amendment were presented in the circuit court. We have examined carefully each of these questions, particularly its manner of adoption by the Legislature and the interrelationship between the Amendment and other constitutional

provisions regarding public debt, and conclude them to be wholly without merit. Accordingly, we resolve all outstanding issues related to the validity of the Amendment and decree that we perceive no impediment to the issuance of bonds pursuant to such Amendment.