600 S.E.2d 554

Rodney SLOAN, Appellant
Below, Appellant,

v.

DEPARTMENT OF HEALTH AND
HUMAN RESOURCES, Appellee
Below, Appellee.

No. 31374.

Supreme Court of Appeals of West Virginia.

Submitted: Jan. 13, 2004.

Filed: Feb. 19, 2004.

Maynard, C.J., dissented with opinion.

Starcher, J., concurred with opinion.

Margaret L. Workman, Margaret Workman Law, L.C., Charleston, for the Appellant.

Darrell V. McGraw, Jr., Attorney General, B. Allen Campbell, Senior Assistant Attorney General, Charleston, for the Appellee.

PER CURIAM.

This is an appeal by Mr. Rodney Sloan (hereinafter "Appellant" or "Mr. Sloan") from a June 26, 2002, order of the Circuit Court of Kanawha County, affirming a decision of the West Virginia Education and State Employees Grievance Board (hereinafter "Grievance Board") upholding Mr. Sloan's termination from employment with the Office of the Chief Medical Examiner (hereinafter "OCME"). Upon thorough review of the record, briefs, and arguments of counsel, we reverse the decision of the lower court and remand with directions to enter an order reinstating Mr. Sloan to his former position and to calculate the back pay award due to Mr. Sloan.

I. Factual and Procedural History

Mr. Sloan commenced his employment with the OCME in 1984 and was promoted to Chief Medico-legal Investigator in 1995. Mr. Sloan served under the leadership of Medical Examiner Dr. Irvin Sopher from his date of hire in 1984 through 1997. In 1997, Dr. James Kaplan replaced Dr. Sopher as West Virginia's Medical Examiner. The evidence produced at the hearings in this matter reveals that Mr. Sloan was given an excellent job rating by Dr. Kaplan as recently as March 1998.

By late 1998, however, the evidence produced at the hearings indicates that the professional relationship between Dr. Kaplan and Mr. Sloan began to deteriorate. At that time, Dr. Kaplan regularly utilized the services of Mr. Bill Gardner as a forensic consultant. Through various sources, Mr. Sloan was apprised that Mr. Gardner's qualifications and experience were questionable, and Mr. Sloan brought these concerns to Dr. Kaplan's attention. Dr. Kaplan was apparently displeased with Mr. Sloan's information and, according to Mr. Sloan, indicated that he would not entertain any such negative information concerning Mr. Gardner.[1]

In December 1998, Dr. Kaplan approached Mr. Sloan concerning the possibility of transferring some of Mr. Sloan's duties to another employee, Mr. Mike Kane, ostensibly on a temporary basis only. In January 1999, Mr. Sloan received a letter from Dr. Kaplan informing him that his title had been changed from Chief Investigator to Chief Investigator Recruitment and that Mr. Kane had been assigned the title of Chief Investigator Operations. Subsequent to this alteration, Mr. Sloan was also reassigned from day shift to night shift.

According to the OSME, sometime in early to mid–1999, Mr. Sloan discovered a bag at the OSME in a long term cooler which contained body parts, with a tag identifying the contents as the remains of decedent David W.[2] Upon making this discovery, the

---

1. Mr. Sloan testified during the hearings that he had received letters from Mr. Gardner's co-workers regarding unprofessional conduct by Mr. Gardner in December 1998. Upon showing the letters to Dr. Kaplan, Mr. Sloan explains that Dr. Kaplan instructed him to ignore any negative information concerning Mr. Gardner.

2. Due to the sensitive nature of this matter regarding the decedent's remains, we identify the

OSME contends that the Appellant contacted Mr. James Lowry of the Charleston Mortuary to inform him that additional body parts, belonging to a body released to the Charleston Mortuary on July 30, 1998,[3] had been discovered. The Appellant, however, failed to inform Dr. Kaplan that these additional remains had been located, and no further action regarding the remains was taken at that time.

On March 15, 2000, the bag allegedly containing some of the David W. remains was rediscovered in the long term cooler by a morgue technician. No formal investigation has been undertaken to determine if the remains were actually those of David W.[4] When Mr. Sloan was confronted by Office Administrator Larry Kennedy regarding the discovered body parts, Mr. Kennedy testified that Mr. Sloan told him he had known about the remains for some period of time but had become busy and had forgotten about the remains.

On March 27, 2000, Mr. Sloan filed a grievance based upon reassignment of his job duties and alteration of his working schedule. On April 5, 2000, a notice of a hearing on Mr. Sloan's grievance was transmitted to the OSME. On April 6, 2000, the OSME dismissed Mr. Sloan from his employment, after fifteen years of service. Mr. Sloan thereafter filed a second grievance, contending that the discharge constituted retaliation for the filing of the prior grievance, age and political discrimination, disparate treatment, and a violation of civil service rules and regulations.

In July and August 2000, Mr. Sloan's two grievances were combined for hearings. Mr. Sloan's essential allegations were that the OSME offered no legitimate proof of an improper body release or improper body handling, no good cause for the termination, and inadequate reason for the alterations in job duties or working hours. Moreover, Mr. Sloan contended that the discharge constituted a reprisal for the filing of March 2000 grievance and that he was treated differently from other employees who were also at fault in the turmoil surrounding the David W. remains. He further argued that by responding to his alleged transgressions with outright termination, the OSME had punished him more severely than other individuals had been punished for misdeeds within the office.

The OSME countered Mr. Sloan's arguments by presenting testimony indicating that the primary justification for Mr. Sloan's discharge was his failure to inform his superiors that portions of a body released in July 1998 remained in a bag in the freezer of the office until March 15, 2000. The OSME also presented evidence indicating that a demotion letter was being drafted as early as January or February 2000 based upon concerns with Mr. Sloan's work habits, such as sleeping on the job and leaving the place of employment for short periods to obtain breakfast. Thus, the OSME contends that, upon learning of Mr. Sloan's failure to inform his superiors of the discovery of additional

decedent by using his last name initial. The decedent David W. had been brought to the OSME in May 1998 by Mr. Gardner. An autopsy had been performed by Dr. Kaplan and Mr. Gardner, and some portions of the flesh had been removed from the body. Because the death of David W. was the subject of a homicide prosecution, portions of the body were transported to Erie, Pennsylvania, for further study. According to the evidence received during the hearings, there was no inventory indicating which portions of the body were removed from the OSME to be transported to Pennsylvania.

3. Mr. Thomas Baldwin, a transport employee for the Charleston Mortuary, testified that Mr. Sloan had released what was thought to be the decedent's entire body on July 30, 1998. Specifically, Mr. Baldwin explained that Mr. Sloan released a box labeled as the David W. remains. Mr. Bald-

win testified that Mr. Sloan had been busy with filling out paperwork and had told Mr. Baldwin to retrieve the box from the cooler.

4. There were factual discrepancies in the hearing testimony regarding whether the remains found in the freezer were actually David W.'s remains. The disagreement centered primarily upon the issue of how much of the body was defleshed after the autopsy. We agree with the lower court's findings in this regard, to the effect that "it was not necessary to focus on 'how much' of the remains were found at OCME. The issue was whether the Appellant failed to notify anyone for approximately a year he had found *any* additional remains." Consequently, we do not belabor the issue of which portions of the remains were defleshed and which portions could have remained in the long term storage.

remains, termination was determined to be the proper resolution.

Subsequent to the presentation of evidence on July 7, 2002; July 18, 2002; August 15, 2002; and October 23, 2002, the Grievance Board denied Mr. Sloan's grievances by order dated January 30, 2003. The board held that the OSME had proven the existence of facts justifying the termination, that Mr. Sloan had been dismissed for good cause, that he was not treated in a disparate manner,[5] and that he was not the victim of reprisal.[6] The Appellant appealed that determination to the Circuit Court of Kanawha County, and the Grievance Board's conclusions were affirmed. It is from that ruling that Mr. Sloan currently appeals, maintaining that the decisions of the Grievance Board and lower court were contrary to law, clearly wrong, or arbitrary and capricious.

## II. Standard of Review

In syllabus point one of *Cahill v. Mercer County Board of Education*, 208 W.Va. 177, 539 S.E.2d 437 (2000), this Court explained as follows:

> Grievance rulings involve a combination of both deferential and plenary review. Since a reviewing court is obligated to give deference to factual findings rendered by an administrative law judge, a circuit court is not permitted to substitute its judgment for that of the hearing examiner with regard to factual determinations. Credibility determinations made by an administrative law judge are similarly entitled to deference. Plenary review is conducted as to the conclusions of law and application of law to the facts, which are reviewed de novo.

Further, West Virginia Code § 29–6A–7 (1998) (Repl.Vol.2001) provides in pertinent part as follows:

(a) The decision of the hearing examiner [of the West Virginia Education and State Employees Grievance Board] is final upon the parties and is enforceable in circuit court.

(b) Either party or the director of the division of personnel may appeal to the circuit court of Kanawha County or to the circuit court of the county in which the grievance occurred on the grounds that the hearing examiner's decision:

(1) Is contrary to law or lawfully adopted rule or written policy of the employer;

(2) Exceeds the hearing examiner's statutory authority;

(3) Is the result of fraud or deceit;

(4) Is clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or

(5) Is arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

In *Martin v. Randolph County Board of Education*, 195 W.Va. 297, 465 S.E.2d 399 (1995), this Court likewise elucidated the extent of this Court's scope of review, explaining as follows:

> in reviewing an ALJ's decision that was affirmed by the circuit court, this Court accords deference to the findings of fact made below. This Court reviews decisions of the circuit under the same standard as that by which the circuit reviews the decision of the ALJ. We must uphold any of the ALJ's factual findings that are supported by substantial evidence, and we owe substantial deference to inferences drawn from these facts.... We review *de novo* the conclusions of law and application of law to the facts.

---

**5.** The Appellant asserts that he was the victim of disparate treatment to the extent that other individuals within the office had improperly handled certain prior situations and had not been terminated for their inappropriate behavior. The Appellant provided examples of five individuals, and the OCME countered by asserting that the Appellant was not similarly situated with these individuals since he was their supervisor and should be held to a different standard.

**6.** The Grievance Board found that the Appellant had established a prima facie case of reprisal since the notice of hearing was served on April 5, 2000, and the termination letter was dated April 6, 2000. Nonetheless, the Grievance Board determined that the OCME had provided a legitimate, non-retaliatory reason for the adverse action by asserting that the Appellant had been terminated for the mishandling of the David W. remains.

195 W.Va. at 304, 465 S.E.2d at 406. This Court has invariably explained that as a reviewing tribunal, we "must determine whether the ALJ's findings were reasoned, *i.e.*, whether he or she considered the relevant factors and explained the facts and policy concerns on which he or she relied, and whether those facts have some basis in the record." *Id.*, 465 S.E.2d at 406.[7]

### III. Discussion

This case involves substantial factual discrepancy regarding the precise justification for Mr. Sloan's termination and the circumstances underlying that termination. In this Court's appellate review, as outlined above, we must accord substantial deference to the credibility determinations and factual findings of the Grievance Board. We must also, however, ascertain the degree to which the hearing examiner properly evaluated the competing concerns presented by the parties and the appropriateness of the manner in which the Grievance Board applied the law to the facts. Such application of law to facts is properly reviewed *de novo* by this Court. Syl. Pt. 1, *Cahill*, 208 W.Va. at 177–78, 539 S.E.2d at 437–38.

█ The legal standard applicable to facts of this nature was enunciated in syllabus point one of *Oakes v. Department of Finance and Administration*, 164 W.Va. 384, 264 S.E.2d 151 (1980), where this Court explained as follows regarding the termination of a state employee: "W.Va.Code, 29–6–15, requires that the dismissal of a civil service employee be for good cause, which means misconduct of a substantial nature directly affecting the rights and interest of the public, rather than upon trivial or inconsequential matters, or mere technical violations of statute or official duty without wrongful intention."[8] *See also Trimble v. West Virginia*

*Board of Directors*, 209 W.Va. 420, 549 S.E.2d 294 (2001). In *Oakes*, an employee had been terminated from his civil service position as postmaster for the state capitol post office for negligent mail handling. This Court held that "good cause" had not been demonstrated to justify the termination. 164 W.Va. at 389, 264 S.E.2d at 154. This Court explained that "nothing in the record indicate[d] that Mr. Oakes had a prior history of negligent or inefficient conduct in his supervision of the Capitol Post Office, nor that he had received any reprimands or been subjected to any disciplinary proceedings." 164 W.Va. at 387, 264 S.E.2d at 153; *see also Blake v. Civil Serv. Comm'n*, 172 W.Va. 711, 310 S.E.2d 472 (1983) (finding no good cause for dismissal for petty theft of clothing); *Guine v. Civil Serv. Comm'n*, 149 W.Va. 461, 141 S.E.2d 364 (1965) (finding no good cause for dismissal).

In *Fox v. Board of Education of Doddridge County*, 160 W.Va. 668, 236 S.E.2d 243 (1977), this Court addressed the issue of whether a teacher's unexcused absence from a parent-teacher conference constituted wilful neglect of duty substantiating his dismissal. This Court found that the dismissal was not supportable and reversed the termination decision, reasoning as follows:

> We believe [dismissal was not warranted] for the simple reason that the punishment does not fit the misdeed. Unexcused absence from those occasions at which attendance is expected may be valid grounds for disciplinary action such as a temporary suspension from teaching responsibilities. But it does not follow that the same recalcitrant conduct calls for permanent banishment of the errant teacher from the school system. Suspension, responsibly exercised, may be a reasonable means of maintaining order and authority over school board employees. Dismissal undoubtedly

---

7. *See also* Syl. Pt. 1, *State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 470 S.E.2d 162 (1996) (holding that "[g]enerally, findings of fact are reviewed for clear error and conclusions of law are reviewed *de novo*. However, ostensible findings of fact, which entail the application of law or constitute legal judgments which transcend ordinary factual determinations, must be reviewed *de novo*. The sufficiency of the information presented at trial to support a finding that a constitu-

tional predicate has been satisfied presents a question of law").

8. West Virginia Code § 29–6–15 was repealed in 1989 as part of the reorganization from the Civil Service Commission to the State Personnel Board. This Court's statements of principles governing the requirements for good cause for termination, however, have remained intact since *Oakes*.

has therapeutic disciplinary qualities. But we believe that dismissal predicated upon an isolated incident of unexcused absence from a parent-teacher conference is so unduly severe as to be arbitrary and unreasonable.

160 W.Va. at 671–72, 236 S.E.2d at 246 (footnote omitted); *see also Beverlin v. Board of Educ. of Lewis County,* 158 W.Va. 1067, 216 S.E.2d 554 (1975) (concluding that dismissal of teacher for unexcused absence for purpose of registering for evening class at university was arbitrary and capricious).

Similarly, in *Tucker v. Board of Education of the Town of Norfolk,* 177 Conn. 572, 418 A.2d 933 (1979), a tenured teacher was fired for insubordination when she took a two-day leave of absence after her superiors had denied permission for such leave. The court in Tucker found that dismissal was too harsh and held:

> We are of the opinion that, although there are circumstances indicating that the plaintiff was "insubordinate" in her conduct, a review of the entire record discloses that the drastic disciplinary action of dismissal constituted exceedingly excessive punishment for the plaintiff's misconduct, and an abuse of discretion, especially in the light of the plaintiff's excellent and unblemished school record as a capable, dedicated teacher.

418 A.2d at 938.

In the opinion of this Court, application of the law, as reviewed above, to the facts of this matter presents the formidable dilemma of choosing a proper punishment to fit the transgression. As the Grievance Board and lower court observed, there is considerable evidence supporting a finding that Mr. Sloan committed a serious oversight; yet the facts of the case equally support a finding that the entire chronicle of events surrounding the handling of the David W. body reveals a very unsatisfactory portrait of the OSME as an entity. Mr. Sloan's participation in this disarray, even if viewed in a light most favorable to the OSME, appears minimal. Even assuming all the allegations of the OSME to be true, Mr. Sloan's most offensive act was his negligence in failing to timely reveal his discovery of additional body parts in the freezer. He was simply one actor in the chaos; yet he appears to have been cast as the scapegoat in this matter, the individual against whom all the blame could be levied.

Based upon the solemn nature of Mr. Sloan's job responsibilities, the OSME could quite possibly have been justified in disciplining Mr. Sloan in some fashion; however, termination appears to be excessive and will not be upheld by this Court. The good cause legally necessary to support a decision of termination is absent in this case. This Court has previously acknowledged that "the work record of a long time civil service employee is a factor to be considered in determining whether discharge is an appropriate disciplinary measure in cases of misconduct." *Buskirk v. Civil Serv. Comm'n,* 175 W.Va. 279, 285, 332 S.E.2d 579, 585 (1985). Mr. Sloan exhibited an excellent work record prior to the difficulties he experienced in his working relationship with Dr. Kaplan.

■ In addition to our finding that the employer lacked good cause to terminate the Appellant, we also note that the Grievance Board correctly found that the Appellant had established a prima facie case of reprisal based upon the fact that the termination immediately followed the filing of the initial grievance. The Grievance Board, however, concluded that the OCME had proven a legitimate, non-retaliatory reason for the termination. Mr. Kennedy testified that a demotion letter had been drafted one week prior to the Appellant's termination. At that time, however, the OSME already knew of the alleged mishandling of the David W. remains. Consequently, it is difficult to accept the OSME's argument that the demotion was translated into a termination based upon the alleged mishandling of the David W. remains. The Appellant contends that the dismissal letter was triggered by the receipt of the notice of hearing on his grievance, as received by the OSME on April 5, 2000. We find that the Grievance Board and lower court conclusion that the OCME proved a legitimate, non-retaliatory reason for the termination to be in error.

Having premised our reversal on the issues of lack of good cause for termination

and the OSME's reprisal for the filing of a grievance, we need not address the Appellant's additional contention regarding disparate treatment. The events leading to the Appellant's termination included the alteration of his job title, duties, hours, and other working conditions. Accordingly, upon remand, Mr. Sloan shall be reinstated to his former position of Chief Medico-legal Investigator or an equivalent position, with working conditions, benefits, and salary no less favorable than those which he obtained in that position. An award of back pay shall also be calculated. With regard to the Appellant's request for an award of attorney fees, such award may be determined on remand, in accordance with West Virginia Code § 29–6A–10 (1998)(Repl.Vol.2001), which provides in pertinent part as follows:

> If an employee appeals to a circuit court an adverse decision of a hearing examiner rendered in a grievance proceeding pursuant to provisions of this article or is required to defend an appeal and the person substantially prevails, the adverse party or parties is liable to the employee, upon final judgment or order, for court costs, and for reasonable attorney's fees, to be set by the court, for representing the employee in all administrative hearings and before the circuit court and the supreme court of appeals, and is further liable to the employee for any court reporter's costs incurred during any administrative hearings or court proceedings: Provided, That in no event shall such attorney's fees be awarded in excess of a total of one thousand five hundred dollars for the administrative hearings and circuit court proceedings nor an additional one thousand dollars for supreme court proceedings....

Reversed and Remanded with Directions.

Chief Justice MAYNARD dissents and reserves the right to file a dissenting opinion.

Justice STARCHER concurs and reserves the right to file a concurring opinion.

MAYNARD, Chief Justice, dissenting.

I dissent in this case because I believe the majority has been inconsistent with regard to the standards it has imposed upon the Office of the Chief Medical Examiner ("OCME").

Approximately seven years ago, this Court upheld a judgment rendered against the State's Chief Medical Examiner, Dr. Irvin Sopher, in the amount of $185,000.00, which included $50,000.00 in punitive damages, for the alleged removal of a decedent's heart during an autopsy without authorization of the decedent's family. *Coleman v. Sopher,* 201 W.Va. 588, 499 S.E.2d 592 (1997). In that case, Dr. Sopher had performed the autopsy at the family's request to determine whether occupational pneumoconiosis had contributed to the decedent's death. Upon receiving a denial of occupational pneumoconiosis survivors' benefits from the Workers' Compensation Division, the family had the body exhumed for a second autopsy. At that point, the family allegedly discovered that the decedent's heart had been removed during the first autopsy. The family filed suit alleging intentional infliction of emotional distress, conversion, and outrageous conduct. Upon appeal, this Court did not find "the award of $135,000.00 in compensatory damages for the emotional suffering of three separate individuals [the decedent's family] to be monstrous, enormous, at first blush beyond all measure, unreasonable or outrageous." *Coleman,* 201 W.Va. at 607, 499 S.E.2d at 611 (footnote omitted). Instead, the Court found that Dr. Sopher's alleged attempt to conceal the removal of the decedent's heart amounted to "willful, reckless indifference and disregard of the Colemans' rights." *Id.,* 201 W.Va. at 603, 499 S.E.2d at 607.[1]

Despite the decision in *Coleman* where this Court held Dr. Sopher liable for mishandling body parts, the majority now curiously refuses to uphold the termination of an employee of the OCME for the same conduct-mishandling of body parts. In the present case, the evidence showed that sometime in early to mid 1999, Mr. Sloan discovered addi-

---

1. I dissented to the decision in *Coleman* because I did not believe that the evidence established that a tort had been committed. Also, I believed

the circuit court abused its discretion by admitting certain testimony during the trial. *Coleman,* 201 W.Va. at 607–08, 499 S.E.2d at 611–12.

tional remains of a body he had previously released to the Charleston Mortuary Service for cremation in July 1998. At that time, Mr. Sloan called the Charleston Mortuary Service and told James Lowry about this discovery. He advised Mr. Lowry that he would let him know what was going to be done after he discussed the matter with Dr. James Kaplan, the Chief Medical Examiner.[2] However, Mr. Sloan did not advise Dr. Kaplan that he had found the additional remains and no further action was taken.

On March 15, 2000, a morgue technician discovered the additional remains in the cooler of the OCME. When confronted about the matter, Mr. Sloan told the Office Administrator at OCME that he knew that the additional remains were in the cooler, but he "got busy and forgot about it." Thereafter, the OCME terminated Mr. Sloan's employment for failing to notify "anyone in the office that a serious mistake had been made in regard to releasing remains in an improper and erroneous manner."

The majority states that this case "reveals a very unsatisfactory portrait of the OCME as an entity" yet, concludes that Mr. Sloan's participation in the events was "minimal." Maj. op. at 559. Such a conclusion is directly contrary to the evidence. Not only did Mr. Sloan fail to disclose the discovery of the additional remains for over a year and a half, the evidence shows that he was the person who authorized the release of the body in July 1998, failing at that time to verify which remains were actually being released. The majority obviously wants to hold the OCME accountable for these mistakes and is even willing to permit an award of punitive damages for such conduct. However, the majority is unwilling to give the OCME the opportunity to remedy these errors by terminating the employees who are responsible. In my opinion, if the majority is going to allow big verdicts against the OCME to stand as it did in *Coleman*, then it needs to permit the OCME to take appropriate steps to ensure that these mistakes do not happen again. By doing otherwise, as in this case, the majority is being both inconsistent and unfair. Accordingly, I respectfully dissent.

2. Dr. Kaplan replaced Dr. Sopher as the State's Chief Medical Examiner in 1997.

**STARCHER, J., concurring.**

I am more than sympathetic to the plight of the administrator of the Office of the Chief Medical Examiner. All parties agree that the Office of the Chief Medical Examiner inherited somewhat of a mess, and is trying to improve the situation.

Given that situation, firing a long-term satisfactory low-level employee without a meaningful improvement period was overkill in this case. If Mr. Sloan had been a top administrator, I would have little problem with the Office of the Chief Medical Examiner's action. But despite his title as "Chief" Investigator, Mr. Sloan's actual salary was more like that of a good typist, and his duties were essentially ministerial.

This is why I joined the majority.